**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**BLUEFIELD DIVISION**

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
AMERIBANK, INC.,

             Plaintiff,

v.

JACK A. BALDINI; DAVID G. COGSWELL;
LOUIS J. DUNHAM; MICHAEL O'BRIEN;
AND JAMES M. SUTTON,

             Defendants.

_____/

CASE NO. 1:12-7050

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff the Federal Deposit Insurance Corporation, as receiver for Ameribank, Inc. ("FDIC-R"), sues Jack A. Baldini, David G. Cogswell, Louis J. Dunham, Michael O'Brien, and James M. Sutton (collectively, "Defendants") for negligence, gross negligence, and breach of fiduciary duty, and alleges:

## NATURE OF ACTION

1.    The FDIC-R brings this lawsuit in its capacity as receiver for Ameribank, Inc. ("Ameribank" or "Bank"), a failed financial institution headquartered in Northfork, West Virginia, against five of Ameribank's former officers. The FDIC-R seeks to recover damages resulting from Defendants' negligence, gross negligence, and breach of fiduciary duty for improperly delegating their duties and for failing to properly supervise a third-party mortgage broker and loan originator, Bristol Home Mortgage Lending, LLC, d.b.a. LendingOne ("Bristol").

2.      Defendants wrongfully allowed Bristol to exercise unfettered and unsupervised control over the underwriting of a large number of loans funded by Ameribank.   Bristol performed all originating, underwriting, processing, and servicing functions for the loans, and the Bank supplied the funds without further analysis by Defendants as required by safe and sound lending practices.

3.      This lending structure was inherently risky for the Bank because it effectively outsourced to Bristol nearly all lending functions for a large number of loans that would not have met the Bank's internal underwriting standards if originated in-house.   Defendants could not delegate to Bristol the duty to ensure the safety and soundness of the Bank's loan portfolio. Defendants remained responsible for managing the risks of the Bank's lending operations, including those conducted through Bristol.   Significant monitoring and internal control systems were warranted to ensure the Bank was funding quality loans and following sound lending practices. However, Defendants failed to provide meaningful oversight or control of Bristol's underwriting of the loans, and Defendants permitted the Bank to fund Bristol-originated loans despite serious deficiencies.   Specifically, Defendants allowed the Bank to fund Bristol-originated loans in violation of: (1) the contract between Bristol and Ameribank, (2) Bristol's loan policies, (3) Ameribank's loan policies, (4) applicable underwriting requirements, and (5) prudent lending practices.

4.      The Bank suffered significant damages as a result of the Defendants' failure to oversee, supervise, and control the relationship with Bristol and the underwriting of the Bristol-originated loans. Defendants are liable to the FDIC-R for compensatory and other damages Ameribank sustained as a result of the Bank funding the Bristol-originated loans without proper supervision or independent review.

2

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 12 U.S.C. § 1331 because actions to which the FDIC-R is a party are deemed to arise under federal law.   12 U.S.C. § 1819(b)(2)(A); *see* 12 U.S.C. § 1811, *et seq.*; 12 U.S.C. § 1819(b)(1); 28 U.S.C. § 1345.

6.      Venue is proper in the Southern District of West Virginia under 28 U.S.C. § 1391(b)(2) or (3).

## PARTIES

### I.      Plaintiff FDIC-R

7.      The FDIC-R is an instrumentality of the United States of America, established and existing under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833.  Among other duties, the FDIC-R is charged with the orderly liquidation of failed banks.  12 U.S.C. § 1821(d).

8.      Ameribank was a federally chartered savings bank headquartered in Northfork, McDowell County, West Virginia, with a branch in Ohio and another in Florida.  Its deposits were FDIC insured.

9.      On September 19, 2008, Ameribank was closed by the United States Office of Thrift Supervision ("OTS"), and the FDIC-R was appointed as receiver pursuant to 12 U.S.C. § 1821(c).  At that time, the FDIC-R succeeded to all the rights, titles, and privileges of Ameribank and its stockholders, account holders, and depositors.  12 U.S.C. § 1821(d)(2)(A)(I).

### II.     The Five Defendants

10.     At different periods of time throughout the Bank's relationship with Bristol, each of the five Defendants was an officer of the Bank.

11.     Defendants Baldini, Sutton, and Dunham also served on the Bank's board of directors ("Board"), but they are sued only for their acts and omissions as officers.

12.     Each Defendant had a duty to monitor the Bank's lending activities, and, in particular, to supervise the Bristol relationship and control the Bank's exposure to risks in funding Bristol-originated loans.

13.     Each of the Defendants have agreed to toll the statute of limitations on the claims raised in this complaint for a period beginning on September 1, 2011, and ending on October 31, 2012.

### James M. Sutton

14.     James M. Sutton was the dominating presence at Ameribank and a driving force behind the Bank's rapid expansion through its arrangement with Bristol.

15.     Sutton was the controlling shareholder of the Bank's holding company, and served as a director of the Bank from 1995 until the Bank failed.  He was also Vice Chairman of the Board from 1995 until June 15, 2006, and Chairman of the Board from June 15, 2006, until October 9, 2007.

16.     Sutton was named Acting President of the Bank on December 21, 2006, and served in that position until January 18, 2007.

17.     While that was the only time he formally held an officer position, Sutton played a key role in initiating the Bristol relationship, and he personally managed the relationship throughout its existence.  When OTS regulators warned the Bank about the risks of the Bristol relationship, Sutton represented that the Bank had adequate internal controls regarding Bristol and the Bristol-originated loans.

18.     Moreover, from January 18, 2007, until October 9, 2007, he functioned as the Bank's primary executive officer.

**Jack A. Baldini**

19.     Jack A. Baldini was interim President from January 18, 2007, to October 9, 2007; a director from January 1995, until Ameribank failed; and Chairman of the Board from 2000 until June 15, 2006.

20.     Under Baldini's and Sutton's joint leadership, the number of Bristol-originated loans funded by Ameribank dramatically increased, despite obvious risks and deterioration in the Bank's loan portfolio.

21.     During that period, Baldini and Sutton were responsible for managing the Bank's operations with Bristol, which were primarily conducted out of the Bank's branch in Palm Beach County, Florida, where Bristol was headquartered.

**Louis J. Dunham**

22.     Louis J. Dunham was the President and Chief Executive Officer ("CEO") of the Bank and a director from January 27, 2005, to on or about December 15, 2006.  He also was the Bank's Florida Branch President from May 2003 to January 27, 2005.

23.     Dunham signed the Bank's controlling agreement with Bristol and all amendments to the agreement.

24.     He also made representations to the financial regulators that Ameribank was adequately overseeing Bristol's underwriting.

**David G. Cogswell**

25.     David G. Cogswell was the Bank's Executive Vice President ("EVP") and Chief Risk Officer ("CRO"), and he also performed the duties of Chief Financial Officer ("CFO") from May 2003 until he resigned on January 18, 2007.

26.     Cogswell conducted due diligence on the Bristol loans, was responsible for conducting internal loan reviews on the Bristol loans, made presentations to Ameribank's Board of Directors regarding concentrations of Bristol-originated loans, and signed approval forms for Bristol-originated loans.

**Michael O'Brien**

27.     Michael O'Brien was the Senior Vice President ("SVP") and Collections Manager ("CM") from May 2003 until he resigned on January 18, 2007.

28.     He was responsible for monitoring collections on the Bristol-originated loans funded with the Bank's assets, but while noting difficulties with collections, he did not raise issues regarding Bristol's grossly deficient underwriting.  O'Brien also conducted due diligence on the Bristol loans and was responsible for conducting internal loan reviews on the Bristol loans.

**FACTUAL ALLEGATIONS**

I.     **Ameribank's Growth Strategy**

29.     Ameribank opened for business in 1906, in Northfork, West Virginia.  For nearly a century, the Bank operated in and served the local West Virginia market, a relatively limited lending area, which by the early 2000s had become economically depressed.  Unable to grow the Bank's loan production in the local area, Sutton set out to develop lending business in other geographic markets.

30.     After an unsuccessful effort to generate loans in North Carolina, Sutton next looked to Florida, hoping to take advantage of a larger, growing market.

31.     In August 2003, Ameribank opened a branch in Palm Beach County, Florida. Sutton hired Dunham as the Florida Branch President to stimulate Ameribank's asset growth

through increased lending.  Cogswell and O'Brien, who were part of Dunham's management team at another bank, were hired along with Dunham.

32.     As a part of their growth strategy, Dunham and Sutton began discussions with Bristol about an arrangement that would allow the Bank to use Bristol's services to expand its mortgage lending quickly and at a low cost.  On May 19, 2004, Dunham executed a Mortgage Loan Sale and Servicing Agreement ("MLSS Agreement") with Bristol on behalf of Ameribank.  The MLSS Agreement allowed Ameribank to enter into a new line of loan production in new geographic markets without incurring the overhead costs generally associated with starting or expanding a new business.  It was designed to grow the Bank's lending through construction and rehabilitation account ("CRA") loans used to buy, rehabilitate, and flip homes in low income areas, with little or no out-of-pocket cost to the borrower.

## II.    The MLSS Agreement

33.     Under the MLSS Agreement, Ameribank was required to fund all CRA loans presented to it by Bristol, provided only that the loans conformed to *Bristol's* policies and underwriting standards.

34.     Moreover, the MLSS Agreement put Bristol in control of all aspects of the lending process by granting Bristol authority to conduct credit evaluations, process, underwrite, document, originate, and service the loans it funded with Ameribank's assets.  Ameribank's role was limited to supplying the loan funds.

35.     Proper due diligence, internal controls, approvals, quality control audits, and ongoing monitoring were warranted for this high-risk arrangement.

36.     The Bristol-originated CRA loans were low-documentation loans to individual investors to purchase and rehabilitate distressed residential properties in 13 states.  A CRA loan

was secured by a mortgage on the property and carried a high interest rate (generally between 15.5 percent and 17.5 percent) and a 5 percent origination fee.  The average principal advanced per loan was $105,000.  Borrowers were required to pay little out of pocket, since the loans usually financed 100 percent of the acquisition and repair costs, as well as closing costs, taxes, and insurance.  The loans were balloon mortgages with the borrowers making interest-only payments for a 12-15 month term.  In many cases, the borrower's out of pocket monthly payment was significantly reduced by amounts paid from an interest reserve.

37.     The MLSS Agreement required Bristol to certify that each CRA loan presented to Ameribank for funding complied with Bristol's underwriting standards.  In many instances, however, Bristol failed to sign this certification, but Ameribank funded the loans anyway.

38.     Defendants did not review the borrower's credit information or the loan documents before allowing Bristol to use Bank assets to fund Bristol-originated loans.

39.     Sutton and Dunham initiated and controlled the Bristol relationship with the aim of quickly expanding Ameribank's operations both geographically and in terms of loan volume. The relationship began shortly after Dunham and his management team, Cogswell and O'Brien, joined the Bank and took control of the newly-established Florida branch.

40.     Dunham, Cogswell, and O'Brien performed all due diligence on Bristol before the MLSS Agreement was executed.  They, along with Sutton and Baldini, also possessed the only operational knowledge within the Bank of the relationship with Bristol.  Other than the three Defendants who were directors, the Bank's Board of Directors had no direct involvement with the Bristol relationship and largely deferred to Dunham and Sutton regarding the negotiation of the MLSS Agreement and its terms.

41.     The Board did not formally approve the MLSS Agreement.  Because the loans funded under the MLSS Agreement were smaller than the $750,000-per-loan amount requiring Board approval under the Bank's loan policy, the Board was not involved in reviewing or approving any of the Bristol-originated loans at issue prior to funding.

42.     Both Dunham and Sutton heavily influenced the Bristol relationship and the Bank's everyday lending operations under its CRA loan program.  They personally negotiated with Bristol over the MLSS Agreement amendments and a warehouse line of credit ("LOC") extended to Bristol, which was used by Bristol to buy back "problem" loans that it had originated.

43.     Despite problems with the Bristol relationship that placed the Bank at increasing risk, Dunham and Sutton allowed the terms of the MLSS Agreement to become increasingly and unreasonably favorable to Bristol.  For example, during the course of the Bristol relationship, the Bank's yield spread on Bristol-originated loans was reduced from prime plus 2.5 percent to prime plus 0.25 percent.

44.     Defendants disregarded warnings from the OTS about the high level of risk associated with its Bristol-related exposure, and they continued to expand the Bank's relationship with Bristol even after problems with the Bristol relationship were, or should have been, apparent.

45.     In 2006, Dunham and Sutton assured examiners that they would provide on-site visitations to Bristol's office to monitor and limit the Bank's risk.  However, they did not conduct such on-site visitations as promised.

46.     Cogswell and O'Brien, acting under and reporting to Dunham, neglected their duties as officers by failing to take even minimally adequate steps to evaluate the loans Bristol offered to the Bank or to report deficiencies in the loan portfolio.

47.     After Dunham, Cogswell, and O'Brien resigned in December 2006 and January 2007, respectively, Sutton and Baldini significantly expanded the CRA loan program operated by Bristol without regard to the then obvious deterioration of Ameribank's CRA loan portfolio.

48.     With the departure of the Dunham team, the Bank lost its primary operational knowledge of the Bristol relationship.

49.     The Bank's CRA loan portfolio grew quickly.  As of February 28, 2005, Bristol loans constituted 200 percent of Ameribank's tier 1 capital plus its Allowance for Loan and Lease Losses ("ALLL").  The number of individual CRA loans in Ameribank's portfolio increased from 81 to 721 from February 2005 to May 2007.  Between June 2006 and April 2007, Ameribank experienced an 88.1 percent growth in CRA loans purchased from Bristol.  By May 31, 2007, the Bristol relationship represented 401 percent of tier 1 capital plus ALLL.

50.     Much of this growth occurred after the Dunham management team resigned.

51.     Instead of replacing the Dunham team with capable management, Sutton and Baldini simply increased their day-to-day involvement with the Bank's affairs, but both were unqualified to oversee, manage, and control the Bank's relationship with Bristol and Bristol's underwriting of CRA loans.

52.     In the first quarter of 2007, Sutton and Baldini violated the Bank's internal limits on CRA loan concentrations.

### III.   __Ameribank's and Bristol's Loan Policies__

53.    The MLSS Agreement required Ameribank to purchase CRA loans that were originated by Bristol in compliance with Bristol's loan policy.  Bristol was to service the loans. Bristol established the requirements, policies, and procedures governing the approval, underwriting, administration, and servicing of the CRA loans.   These standards consisted primarily of the borrower's credit score and the property's "as repaired" value as a percentage of the requested loan amount.  Under Bristol's loan policy, however, the borrower's employment and income were "stated" – *i.e.,* the policy required no verification of either.

54.    Bristol's abbreviated loan approval policy was not in conformity with Ameribank's loan policy (which Defendants considered inapplicable under the MLSS Agreement) and appears to have been adopted by the MLSS Agreement simply to increase Ameribank's loan volume.

55.    Under the MLSS Agreement, Ameribank could only reject CRA loans offered to it by Bristol if the loans failed to meet Bristol's underwriting standards.

56.    Ameribank's participation in the Bristol lending process was limited to signing and returning Bristol's Request for Preliminary Approval of Purchase of Loan form (a one-page document) and funding loans prior to closing.

57.    However, in many instances, Ameribank did not even sign this one-page document before funding the loan, and none of the Defendants required those forms to be signed before allowing Ameribank to fund the loans.

58.    Despite regulators' repeated warnings, Defendants unreasonably relied on Bristol at every stage of the lending process, notwithstanding that Bristol engaged in seriously deficient loan underwriting, administration, and approval practices, including:

a.  extending loans evaluated or approved by financially interested personnel or third-party contractors and otherwise extending loans without independent review or analysis;

b.  approving loans involving speculative ventures or repayment sources to borrowers who were not creditworthy and for projects that provided inadequate collateral;

c.  failing to document loan approvals, underwriting, and administration, and failing to ensure that loan proceeds were used in accordance with loan terms, the MLSS Agreement, and loan policies;

d.  financing multiple projects controlled by the same borrower;

e.  extending loans on the basis of improperly performed appraisals or on the basis of faulty estimates of rehabilitation costs; and

f.  relying on borrowers' and guarantors' stated financial statements, which were often inadequate or inaccurate, with no verification.[1]

59.   The Bristol loan policy provisions relevant to the deficient underwriting are as follows:

a.  The maximum allowable amount of any single CRA loan was $300,000.

b.  All loans required a personal guaranty.

c.  Loan proceeds were to be used to finance acquisition, repair, and closing costs.  Only in certain cases could loan proceeds be used to fund interest reserves, and then only in specified amounts.

---

[1]  Verification of employment and income were not required under Bristol's underwriting guidelines.

d. The collateral was required to be investment real property improved with one to four single-family residences, each with a minimum of 650 square feet of living space, and a maximum loan-to-value ("LTV") ratio of the property's appraised "as repaired" value of either 70 or 75 percent.  There also were limits on the percentage of the loan that could be used for repair costs and interest reserves.

e. The "as repaired" value of the property was to be determined by an independent licensed appraiser designated by Bristol.

f. A credit analysis for each borrower was to be based on employment history and income stated by the borrower and a credit report dated no more than 90 days before the date of the loan application.

g. The collateral property had to be located in one of Bristol's "trade areas," and the primary borrower had to reside in, or have a local connection to, the area.

h. Underwriters had the right to limit the amount of profit (or "flip fee") realized by the seller if it was excessive in relation to the purchase price paid by the borrower.

i. A Bristol officer was required to execute and deliver a single-page "Request for Preliminary Approval of Purchase of Loan" ("Approval Form") to Ameribank, certifying that the loan met Bristol's underwriting guidelines, and an Ameribank officer was then required to execute and return the Approval Form to Bristol prior to funding.

60.    Although Defendants treated the Bristol CRA loan program as if it were exempt from Ameribank's loan policy, no exemption was reflected in the Bank's policy or was ever

approved by Ameribank's Board of Directors.  All of the deficient loans fell below the standards set forth in the Bank's loan policy.

61.    Further, two of the deficient loans originated by Bristol were funded in September 2007 after the OTS ordered Ameribank to stop accepting loans from Bristol altogether.

## IV.    Defendants' Duties to Monitor or Supervise the Bristol Relationship

62.    Defendants failed to adequately monitor or supervise the Bank's funding of Bristol-originated loans during the periods when each was responsible for overseeing Bristol's activities.  Each Defendant is liable for damages for their tortious conduct in connection with the Bristol-originated loans that were funded during the time periods for which the Defendant had a duty to supervise those activities.

### Defendants' Duties

63.    Dunham, Cogswell, and O'Brien were the Bank's core management team, and they were central to the Bank's relationship with Bristol from the time the original MLSS Agreement was executed until they resigned two and a half years later.

64.    Because they were the Bank's only senior officers in Florida, where Bristol was headquartered, Dunham, Cogswell, and O'Brien had the most interaction with Bristol while they were at the Bank. Additionally, each had management and reporting responsibilities for the Bank's Bristol CRA loans by virtue of their respective positions.

65.    Dunham executed the MLSS Agreement under the lending authority delegated to him by the Board in the Bank's loan policy.  As the President and CEO, Dunham was responsible for the overall management of Ameribank's lending operations during his tenure.

66.    Cogswell and O'Brien, together with Dunham, managed significant aspects of the Bristol relationship, regularly communicating with Bristol's officers and advising Ameribank's

Board of Directors of the status of the relationship and use of the Bank's assets to fund Bristol loans.  Cogswell and O'Brien also were responsible for conducting internal reviews on the Bristol CRA loans and for monitoring compliance with approval and underwriting requirements.

67.     O'Brien also was responsible for managing and reporting on problem loans and delinquencies in the Bristol CRA loan portfolio.

68.     Cogswell was responsible for managing the risks associated with the Bank's lending operations generally.  With respect to the Bristol CRA loans in particular, he had a duty to identify and report on the performance, growth, and risks of the portfolio directly to the Board. To maintain Cogswell's independence necessary to perform these risk-management and reporting duties, the Board did not delegate to Cogswell any authority to approve loans. Nevertheless, Cogswell signed approval forms for some Bristol-originated loans and signed the document increasing Bristol's LOC.

69.     Moreover, although Cogswell was responsible for recommending all loan policy revisions to the Board, he did not propose any policies for administering the Bristol CRA loan program.

70.     When Dunham resigned in December 2006, Sutton took over as the Bank's Acting President.  A month later, when Cogswell and O'Brien resigned, the Board named Baldini as interim President.  However, even after Baldini was named President, Sutton, together with Baldini, continued to manage the Bank's daily operations.  Cogswell and O'Brien were not formally replaced.

71.     Sutton and Baldini controlled the Bank's operations until October 9, 2007, when the Bank hired a new president pursuant to an OTS Cease and Desist Order. Under Sutton and

15

Baldini's management, the Bank violated its internal policy limitations on the Bristol CRA loan portfolio.

72.     Although Sutton was formally an officer for only the one-month period he was Acting President, he was functionally the Bank's primary executive after that period due to his continued day-to-day management of the Bank, and his relationship with Bristol in particular.

**Defendants' Time Periods of Responsibility**

73.     Dunham had oversight responsibility for the Bristol relationship as an officer of Ameribank from May 19, 2004, until on or about December 15, 2006.

74.     Cogswell had oversight responsibility for the Bristol relationship as an officer of Ameribank from May 19, 2004, until January 18, 2007.

75.     O'Brien had oversight responsibility for the Bristol relationship as an officer of Ameribank from May 19, 2004, until January 18, 2007.

76.     Sutton had oversight responsibility for the Bristol relationship as an officer of Ameribank from December 21, 2006, until October 9, 2007

77.     Baldini had oversight responsibility for the Bristol relationship as an officer of Ameribank from January 18, 2007, until October 9, 2007.

**V.     Regulators' Warnings and Defendants' Response**

78.     Ameribank was examined regularly by the OTS, its primary regulator.  After each examination, the OTS's conclusions regarding the Bank's safety and soundness were delivered to the Bank in a Report of Examination ("RoE").

79.     The OTS RoEs Ameribank received from 2004 through 2007 contained warnings and criticisms about the Bristol relationship.  In its 2004 RoE, the OTS noted that the Bank's risk profile had increased as a result of the newly-established Florida Branch.

16

80.     In the RoE delivered on March 17, 2005, the OTS warned Ameribank about the "rapid growth and the higher-risk nature" of the Bristol concentration.  OTS examiners identified specific "elevated risks," including the risk of Bristol's default and a downturn in the real estate market.  Examiners noted that Dunham was aware of the risks, but that he had informed them that the risks were mitigated due to the Bank's prior due diligence, periodic reviews, and on-site visits to Bristol.  Sutton also informed examiners that he would conduct periodic visits to Bristol's new Florida office.

81.     The OTS recommended that the Bank adopt internal limits on assets related to the Bristol relationship.  In accordance with this recommendation, Dunham, Cogswell, and O'Brien adopted limits on the Bristol loan concentration, but those policy limits were not in accordance with the OTS's recommendations and they were subsequently raised.  Moreover, Sutton and Baldini later violated these limits after they assumed direct oversight responsibility for the Bristol relationship in the first quarter of 2007.

82.     The examiners also expressed concern that the Bank had achieved its rapid loan growth without having hired an additional loan officer as originally planned.  Although Dunham assured the OTS that the Bank intended to hire another loan officer, the Bank never did.

83.     In the RoE delivered on September 21, 2005, the OTS criticized the Bank's failure to increase staff to support its rapid loan growth as previously recommended.  Dunham and Sutton again assured the OTS that the Bank would hire additional staff.

84.     In the OTS Melded Limited Examination delivered on August 8, 2006, examiners noted the "inherent risk in the [Bristol CRA] portfolio, since the lending base is calculated based on 'as improved values.'"

85.     Dunham and Sutton represented to examiners that the systems in place internally at the Bank and at Bristol mitigated such concerns.

86.     Examiners also noted that all loan categories came in below budget, except for CRA loans, which significantly exceeded budget projections.

87.     The FDIC-R has identified at least 32 deficient loans originated by Bristol ("Deficient Loans") that were funded from September 30, 2006, through September 30, 2007, after the Bank had received these warnings.

88.     On May 25, 2007, the OTS issued a Supervisory Directive requiring the Bank to cease funding any Bristol-originated loans by August 31, 2007, and placing other limits on Ameribank's relationship with Bristol.

89.     On October 19, 2007, the OTS issued a Cease and Desist Order to the Bank imposing additional requirements and restrictions.

90.     The Bank failed on September 19, 2008.

## VI.    Examples of Deficient Loans

91.     All of the Deficient Loans violated Bristol's loan policy (as well as Ameribank's loan policy), as incorporated in the MLSS Agreement, in numerous respects.  The Deficient Loans were also funded after examiners had repeatedly warned Defendants about the risks associated with Bristol-originated CRA loans.

92.     By way of example, 32 of the Deficient Loans are summarized below. Ameribank failed to sign the loan approval form for 21 out of these 32 example Deficient Loans.

**K. L. Loan**

93.     The original principal amount of the loan to K. L. was $149,480. The loan was funded by the Bank on or about September 30, 2006.  Loan deficiencies include, without limitation, the following:

        a.   The loan was approved based on inadequate information concerning borrower's financial condition.

        b.   The number of financed properties owned by the borrower was not taken into consideration in determining his ability to repay the loan.

        c.   The loan was extended in violation of limits on geographic location of borrower in relation to the subject property; the borrower neither resided nor had a local connection to the area where the property was located.

        d.   The loan was extended without obtaining a personal guaranty.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the K. L. Loan.  Defendants' action and omission caused damages.

**L. T. Loan**

94.     The original principal amount of the loan to L. T. was $142,848. The loan was funded by the Bank on or about October 6, 2006.  Loan deficiencies include, without limitation, the following:

        a.   The loan was extended without obtaining a personal guaranty.

        b.   The amount of the loan exceeded the LTV limitation of 70% of the "as repaired" value applicable for this loan program.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the L. T. Loan.  Defendants' action and omission caused damages.

**J. H. Loan**

95.     The original principal amount of the loan to J. H. was $151,728.The loan was funded by the Bank on or about November 10, 2006.   Loan deficiencies include, without limitation, the following:

    a.   The loan was extended without obtaining a personal guaranty.

    b.   The loan was extended without obtaining a credit report on the borrower and based on inadequate information about his financial status.

    c.   An appraisal was not obtained on the property.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the J. H. Loan.  Defendants' action and omission caused damages.

**G. H. R. Loan**

96.     The original principal amount of the loan to G. H. R. was $154,570.  The loan was funded by the Bank in or about November 2006.   Loan deficiencies include, without limitation, the following:

    a.   The loan was extended without obtaining a personal guaranty.

    b.   The amount of the loan exceeded the LTV limitation of 75% of the "as repaired" value applicable for this loan program.

    c.   The loan was extended in violation of limits on geographic location of borrower in relation to the subject property because the borrower neither resided nor had a local connection to the area where the property was located.

    d.   The loan was extended based on inadequate information and analysis about the borrower's financial status.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the G. H. R. Loan.  Defendants' action and omission caused damages.

**M. B. Loan**

97.     The original principal amount of the loan to M. B. was $119,132. The loan was funded by the Bank on or about November 10, 2006.   Loan deficiencies include, without limitation, the following:

      a.   The loan was extended without obtaining a personal guaranty.

      b.   The amount of the loan exceeded the LTV limitation of 75 percent of the "as repaired" value applicable for this loan program.

      c.   The funds advanced for acquisition, repair, and closing costs exceeded the maximum of 65 percent of the LTV proceeds.

      d.   The loan was funded without required approvals.

      e.   The loan was extended based on inadequate information and analysis about her financial status.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the M. B.Loan.  Defendants' action and omission caused damages.

**T. L. Loan (#1)**

98.     The original principal amount of this loan to T. L. was $195,179.  The loan was funded by the Bank on or about November 10, 2006.   Loan deficiencies include, without limitation, the following:

      a.   The loan was extended based on inadequate information and analysis about his financial status.

      b.   The loan was extended without a credit report on the borrower.

    c.   The loan was extended without obtaining a personal guaranty.

    d.   The loan was funded without the required approvals.

    e.   The repair costs were twice the maximum 25 percent of loan proceeds permitted to be advanced for repair costs.

    f.   The "flip fee" received by the seller was excessive when compared to the purchase price, as it was 54 percent of the purchase price.

    g.   The funds advanced for acquisition, repair, and closing costs exceeded the maximum of 65% of the LTV proceeds.

    h.   The loan was secured by collateral outside Bristol's geographic trade area.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the T. L. Loan.  Defendants' action and omission caused damages.

**T. L. Loan (#2)**

99.    The original principal amount of this loan to T. L. was $149,855. The loan was funded by the Bank on or about November 10, 2006.  Loan deficiencies include, without limitation, the following:

    a.   The loan was extended based on inadequate information and analysis about his financial status.

    b.   The loan was extended without a credit report on the borrower.

    c.   The loan was extended without obtaining a personal guaranty.

    d.   The loan was funded without the required approvals.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the T. L. Loan.  Defendants' action and omission caused damages.

**M. L. Loan**

100.    The original principal amount of the loan M. L. to was $187,200. The loan was funded by the Bank on or about November 10, 2006.  Loan deficiencies include, without limitation, the following:

      a.   The loan was extended without a current credit report for the borrower.

      b.   The loan was extended based on inadequate information and analysis about her financial status.

      c.   The loan was extended in violation of requirements concerning the purpose of the loan and use of loan proceeds.

      d.   The collateral was inadequate under this loan program and or wrongly valued.

      e.   An appraisal was not obtained for this loan.

      f.   The loan was extended without obtaining a personal guaranty.

      g.   The loan file specifically recognizes that this was a low quality credit.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the M. L. Loan.  Defendants' action and omission caused damages.

**K. M. Loan**

101.    The original principal amount of the loan to K. M. was $459,665. The loan was funded by the Bank on or about December 12, 2006.  Loan deficiencies include, without limitation, the following:

      a.   The amount of the loan exceeded the $300,000 single-loan amount limit.

      b.   The loan was extended without a credit report on the borrower.

      c.   The loan was extended based on inadequate information and analysis about his financial status.

23

    d.   The repair costs exceeded the maximum 25 percent of loan proceeds permitted to be advanced for repair costs.

    e.   The loan was extended without obtaining a personal guaranty.

    f.   The loan was funded without the required approvals.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the K. M. Loan.  Defendants' action and omission caused damages.

### L. R. Loan

102.    The original principal amount of the loan to L. R. was $281,250. The loan was funded by the Bank on or about December 12, 2006.  Loan deficiencies include, without limitation, the following:

    a.   The appraisal inaccurately or wrongly valued the collateral.

    b.   The amount of funds advanced for an interest reserve exceeded the maximum of 10 percent of loan proceeds.

    c.   The borrower paid a "flip fee" of 8.5 percent, which was clearly reflected in the loan files.  The amount of the flip fee was added to the purchase price of the property.  The total amount of flip fee and the purchase price was reflected in the Settlement Statement as the purchase price.  The Settlement Statement did not indicate that a portion of that amount was attributable to a flip fee.

    d.   The loan was extended based on inadequate information and analysis about his financial status.

    e.   The loan was extended without obtaining a personal guaranty.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the L. R. Loan.  Defendants' action and omission caused damages.

24

**S. B. Loan**

103.    The original principal amount of the loan to S. B. was $206,832. The loan was funded by the Bank on or about December 12, 2006.  Loan deficiencies include, without limitation, the following:

      a.   The loan was extended without a credit report on the borrower.

      b.   The loan was extended based on inadequate information and analysis about his financial status.

      c.   The repair costs exceeded the maximum 25 percent of loan proceeds permitted to be advanced for repair costs.

      d.   The loan was extended without obtaining a personal guaranty.

      e.   The loan was funded without the required approvals.

      f.   The loan was secured by collateral outside Bristol's geographic trade area.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the S. B. Loan.  Defendants' action and omission caused damages.

**M. G. Loan**

104.    The original principal amount of the loan to M. G. was $152,768. The loan was funded by the Bank on or about December 12, 2006.  Loan deficiencies include, without limitation, the following:

      a.   The loan was extended without obtaining a personal guaranty.

      b.   The loan was extended based on an outdated appraisal.

      c.   The loan was funded without required approvals.

      d.   The loan was extended without a current credit report for the borrower.

      e.   The loan was extended based on inadequate information and analysis about her financial status.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the M. G. Loan.  Defendants' action and omission caused damages.

### T. H. Loan

      105.   The original principal amount of the loan to T. H. was $174,675. The loan was funded by the Bank on or about January 17, 2007.  Loan deficiencies include, without limitation, the following:

      a.   The loan was extended without a credit report for the borrower.

      b.   The loan was extended based on inadequate information and analysis about his financial status.

      c.   The loan was extended without obtaining a personal guaranty.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the T. H. Loan.  Defendants' action and omission caused damages.

### K. and L. P. Loan

      106.   The original principal amount of the loan to K. and L.P. was $467,480.  The loan was funded by the Bank on or about January 17, 2007.  Loan deficiencies include, without limitation, the following:

      a.   The amount of the loan exceeded the maximum single-loan amount of $300,000.

      b.   The loan was extended without a credit report for the borrowers.

      c.   The loan was extended based on inadequate information and analysis about their financial status.

d.  The loan was extended without obtaining a personal guaranty.

e.  The loan was funded without the required approvals.

f.  The loan was secured by collateral outside Bristol's geographic trade area.

g.  The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.  The appraisal inadequately or wrongly valued the collateral.

h.  The borrower paid a "flip fee" of 21 percent, which was reflected in the loan files.  The amount of the flip fee was added to the purchase price of the property.  The total amount of flip fee and the purchase price was reflected in the Settlement Statement as the purchase price.  The Settlement Statement did not indicate that a portion of that amount was attributable to a flip fee.

i.  The amount of funds advanced for an interest reserve exceeded the maximum of 10 percent of loan proceeds.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the K. and L.P. Loan.  Defendants' action and omission caused damages.

**M. H. Loan (a)**

107.  The original principal amount of the loan to M. H. was $144,695.  The loan was funded by the Bank on or about March 2007.  Loan deficiencies include, without limitation, the following:

a.  The loan was extended based on inadequate information and analysis about the borrower's financial status.

b.  The repair costs exceeded the maximum 25 percent of loan proceeds permitted to be advanced for repair costs.

c.   The loan was extended without obtaining a personal guaranty.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the M. H. Loan.  Defendants' action and omission caused damages.

### G. and F. G. Loan (#1)

108.   The original principal amount of this loan to G. and F. G. was $207,350.  The loan was funded by the Bank on or about March 7, 2007.  Loan deficiencies include, without limitation, the following:

a.   The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.

b.   The loan was extended without a credit report for the borrowers.

c.   The loan was extended based on inadequate information and analysis about their financial status.

d.   The loan was extended without obtaining a personal guaranty.

e.   The loan was funded without the required approvals.

f.   The loan was extended in violation of the requirement that proceeds be used for acquisition, repair, and closing costs only.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the G. and F. G. Loan.  Defendants' action and omission caused damages.

### G. and F. G. Loan (#2)

109.   The original principal amount of this loan to G. and F. G. was $196,020.  The loan was funded by the Bank on or about March 7, 2007.  Loan deficiencies include, without limitation, the following:

a.   The loan was extended without a credit report for the borrowers.

b.  The loan was extended based on inadequate information and analysis about their financial status.

c.  The loan was extended without obtaining a personal guaranty.

d.  The loan was funded without the required approvals.

e.  The loan was extended in violation of the requirement that proceeds be used for acquisition, repair, and closing costs only.

f.  The appraisal incorrectly or wrongly valued the collateral.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the G. and F. G. Loan.  Defendants' action and omission caused damages.

**E. F. Loan**

110.   The original principal amount of the loan to E. F. was $163,751.  The loan was funded by the Bank on or about February 26, 2007.   Loan deficiencies include, without limitation, the following:

a.  The loan was extended without a credit report for the borrower.

b.  The loan was extended based on inadequate information and analysis about his financial status.

c.  The loan was extended without obtaining a personal guaranty.

d.  The repair costs exceeded the maximum 25 percent of loan proceeds permitted to be advanced for repair costs.

e.  The loan was secured by collateral outside Bristol's geographic trade area.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the E. F. Loan.  Defendants' action and omission caused damages.

### J. A. and T. S. Loan

111.    The original principal amount of the loan to J. A. and T. S. was $349,685.  The loan was funded by the Bank on or about April 11, 2007.  Loan deficiencies include, without limitation, the following:

> a.  The amount of the loan exceeded the maximum single-loan amount of $300,000.
>
> b.  The loan file contains no documentation regarding repair costs, and the amount placed in escrow presumably for repairs exceeded the repair amount in the appraisal.
>
> c.  The loan was extended without obtaining current credit reports on the borrowers.
>
> d.  The loan was extended based on inadequate information and analysis about their financial status.
>
> e.  The loan was extended without obtaining a personal guaranty.
>
> f.  Bristol did not certify that this loan met its underwriting guidelines as required by the MLSS Agreement, but Ameribank funded the loan anyway.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the J. A. and T. S. Loan.  Defendants' action and omission caused damages.

### P. F. Loan

112.    The original principal amount of the loan to P. F. was $64,844.  The loan was funded by the Bank on or about April 11, 2007.  Loan deficiencies include, without limitation, the following:

    a.  The loan was extended based on inadequate information and analysis about his financial status.

    b.  The loan was extended without obtaining a personal guaranty.

    c.  The loan was funded without the required approvals.

    d.  The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.

    e.  The funds advanced to cover acquisition, repair, and closing costs exceeded the maximum limit of 65 percent of loan proceeds.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the P. F. Loan.  Defendants' action and omission caused damages.

**T. B. Loan**

113.    The original principal amount of the loan to T. B. was $166,260.  The loan was funded by the Bank on or about April 11, 2007.  Loan deficiencies include, without limitation, the following:

    a.  The loan was extended based on inadequate information and analysis about his financial status.

    b.  The loan was extended without obtaining a personal guaranty.

    c.  The loan was funded without the required approvals.

    d.  The funds advanced to cover acquisition, repair, and closing costs exceeded the maximum limit of 65 percent of loan proceeds.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the T. B. Loan.  Defendants' action and omission caused damages.

**B. V. Loan**

114.    The original principal amount of the loan to B. V. was $376,640.  The loan was funded by the Bank on or about April 11, 2007.  Loan deficiencies include, without limitation, the following:

    a.  The amount of the loan exceeded the maximum single-loan amount of $300,000.

    b.  The loan was extended based on inadequate information and analysis about his financial status.

    c.  The loan was extended without obtaining a personal guaranty.

    d.  The loan was funded without the required approvals.

    e.  The LTV exceeded the maximum of 70 percent of "as repaired" value limit for the loan program.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the B. V. Loan.  Defendants' action and omission caused damages.

**B. S. Loan**

115.    The original principal amount of the loan to B. S. was $64,090.  The loan was funded by the Bank on or about May 11, 2007.  Loan deficiencies include, without limitation, the following:

    a.  The loan was extended based on inadequate information and analysis about his financial status.

    b.  The loan was extended without a credit report for the borrower.

    c.  The loan was extended without obtaining a personal guaranty.

    d.  The loan was funded without the required approvals.

  e. The LTV exceeded the maximum of 70 percent of "as repaired" value limit for the loan program.

  f. The seller received a 48 percent "flip fee" from the borrower, which was excessive in relation to the purchase price.

  g. An appraisal was not received before the loan was extended.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the B. S. Loan.  Defendants' action and omission caused damages.

**R. 12 Loan**

  116. The original principal amount of the loan to R. 12 was $227,430.  The loan was funded by the Bank on or about June 5, 2007.  Loan deficiencies include, without limitation, the following:

  a. The loan was extended based on inadequate information and analysis about the borrower's financial status.

  a. The loan was extended without a credit report for the borrower.

  b. The loan was extended without obtaining a personal guaranty.

  b. The amount of the interest reserve exceeded the maximum of 10 percent of the loan proceeds.

  c. The loan was secured by collateral outside Bristol's geographic trade area.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the R. 12 Loan.  Defendants' action and omission caused damages.

**T. G. Loan (#1)**

117.    The original principal amount of this loan to T. G. was $128,180.  The loan was funded by the Bank on or about June 5, 2007.  Loan deficiencies include, without limitation, the following:

>    a.   The loan was extended based on inadequate information and analysis about his financial status.
>
>    b.   The loan was extended without a credit report for the borrower.
>
>    c.   The loan was extended without obtaining a personal guaranty.
>
>    d.   The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the T. G. Loan.  Defendants' action and omission caused damages.

**D. S. C. Loan**

118.    The original principal amount of the loan to D. S. C. was $186,238.  The loan was funded by the Bank on or about June 5, 2007.  Loan deficiencies include, without limitation, the following:

>    a.   The loan was extended based on inadequate information and analysis about his financial status.
>
>    b.   The loan was extended without a credit report for the borrower.
>
>    c.   The loan was extended without obtaining a personal guaranty.
>
>    d.   The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.
>
>    e.   The loan was extended without required approvals.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the D. S. C. Loan.  Defendants' action and omission caused damages.

### A. A. Loan

119.    The original principal amount of the loan to A. A. was $203,580.  The loan was funded by the Bank on or about July 10, 2007.  Loan deficiencies include, without limitation, the following:

  a.   The amount of the interest reserve exceeded the maximum of 10 percent of the loan proceeds.

  b.   The loan was extended based on inadequate information and analysis about her financial status.

  c.   The loan was extended without a credit report for the borrower.

  d.   The loan was extended without obtaining a personal guaranty.

  e.   The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.

  f.   The loan was extended without required approvals.

  g.   The loan was secured by collateral outside Bristol's geographic trade area.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the A. A. Loan.  Defendants' action and omission caused damages.

### B. M. Loan

120.    The original principal amount of the loan to B. M. was $102,120.  The loan was funded by the Bank on or about July 10, 2007.  Loan deficiencies include, without limitation, the following:

  a.   The loan was extended based on inadequate or wrongly valued collateral.

    b.   The loan was extended based on inadequate information and analysis about her financial status.

    c.   The loan was extended without obtaining a personal guaranty.

    d.   The loan was extended without required approvals.

    e.   The loan was secured by collateral outside of Bristol's geographic trade area.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the B. M. Loan. Defendants' action and omission caused damages.

**T. G. Loan (#2)**

121.   The original principal amount of this loan to T. G. was $167,625. The loan was funded by the Bank on or about April 6, 2007. Loan deficiencies include, without limitation, the following:

    a.   The loan was extended based on inadequate information and analysis about his financial status.

    b.   The loan was extended without a credit report for the borrower.

    c.   The loan was extended without obtaining a personal guaranty.

    d.   The loan was extended without required approvals.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the T. G. Loan. Defendants' action and omission caused damages.

**L. M. Loan**

122.   The original principal amount of the loan to L. M. was $145,522. The loan was funded by the Bank on or about August 6, 2007. Loan deficiencies include, without limitation, the following:

a.  The loan was extended based on inadequate information and analysis about her financial status.

b.  The loan was extended without obtaining a personal guaranty.

c.  The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the L. M. Loan.  Defendants' action and omission caused damages.

**M. H. Loan (b)**

123.    The original principal amount of this loan to M. H. was $158,340.  The loan was funded by the Bank on or about September 13, 2007.   Loan deficiencies include, without limitation, the following:

a.  The loan was extended based on inadequate information and analysis about the borrower's financial status.

b.  The loan was extended without obtaining a personal guaranty.

c.  The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.

d.  The seller received a 38 percent "flip fee" from the borrower, which was excessive in relation to the purchase price.

e.  The number of financed properties owned by the borrower was not taken into consideration in determining the borrower's ability to repay the loan.

f.  The loan was extended in violation of limits on geographic location of borrower in relation to the subject property because the borrower neither resided nor had a local connection to the area where the property was located.

g.   The loan was funded after the OTS instructed the Bank to stop accepting loans from Bristol.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the M. H. Loan.  Defendants' action and omission caused damages.

**M. N. Loan**

124.    The original principal amount of the loan to M. N. was $168,896.  The loan was funded by the Bank on or about September 30, 2007.   Loan deficiencies include, without limitation, the following:

a.   The loan was funded after the OTS instructed the Bank to stop accepting loans from Bristol.

b.   The loan was extended based on inadequate information and analysis about her financial status.

c.   The loan was extended without obtaining a personal guaranty.

d.   The LTV exceeded the maximum of 75 percent of "as repaired" value limit for the loan program.

e.   The loan was extended without obtaining a credit report on the borrower.

Based upon the above-listed deficiencies, Defendants should not have allowed the Bank to fund the M. N. Loan.  Defendants' action and omission caused damages.

**COUNT I –NEGLIGENCE UNDER STATE LAW**
**(Against All Defendants)**

125.    The FDIC-R realleges and incorporates by reference the allegations set forth in paragraphs 1 through 124 above.

126.    This is a state law action for damages against all Defendants for their negligence as officers.

127.     As officers of a federally-chartered bank headquartered in West Virginia, the Defendants' fiduciary duties were governed by West Virginia law.

128.     Under West Virginia law, officers must perform their duties in good faith, with the care that a person in a like position would reasonably exercise under similar circumstances, and in a manner that the officer reasonably believes to be in the best interests of the Bank.

129.     Defendants, as officers, each had responsibilities and duties with respect to the Bank's lending operations in general, and the Bristol-related lending activities in particular, by virtue of their respective official positions as officers, their delegated management or operational functions, and/or by personally performing or controlling (or by assuming or undertaking responsibility to personally perform or control) or certain functions.

130.     By their actions and omissions, Defendants breached their duties of care by negligently performing and/or failing to perform their respective duties as officers.  Specifically, Defendants negligently failed to supervise the Bristol relationship, failed to adhere to applicable loan policies and prudent lending practices, and allowed the Bank to fund the Deficient Loans.

**<u>Failure to Supervise Bristol Relationship</u>**

131.     By virtue of their knowledge and experience in the banking industry, Defendants knew or should have known that the structure and terms of the Bank's relationship with Bristol exposed the Bank to heightened risks.

132.     What is more, Defendants were aware of the regulators' warnings about the risks of the Bristol relationship and Ameribank's rapid growth, and advice concerning the need to manage those risks and implement safeguards.

133.     Nonetheless, despite being aware of the risks, Defendants failed to monitor Ameribank's exposure to risk in connection with the Bank's Bristol-related lending activities.

134.     Defendants failed to (i) monitor Bristol and the Bristol-originated CRA loans for adherence to lending policies, applicable requirements, and sound lending practice, and enforce Bristol's adherence to such policies, requirements, and practices; (ii) adhere to Ameribank's lending policies, applicable requirements, and sound lending practices; and (iii) require, monitor, and enforce adherence to such policies, requirements and practices by other Ameribank employees over whom they exercised supervisory control.

135.     Defendants knew, or should have known through the exercise of reasonable diligence, that their practices and the practices of other Ameribank employees and Bristol were improper, imprudent, and harmful to Ameribank.

### Negligence in Funding Loans

136.     Defendants negligently allowed the Bank to fund Bristol-originated loans that lacked required approvals by Bristol and Ameribank and/or failed to comply with Bristol's loan policy or other MLSS Agreement requirements.

137.     Defendants did not review the Bristol-originated loans to determine whether the loans complied with Bristol's loan policy and other MLSS Agreement requirements before funding.

138.     By allowing loans to be automatically funded without any review before funding, Defendants failed to exercise any care whatsoever with respect to the funding of the Bristol-originated loans.

139.     Defendants negligently allowed the Bank to fund deficient loans it was not required to purchase under the MLSS Agreement.

140.     Defendants also negligently failed to enforce the Bank's rights under the MLSS Agreement.

40

141.     As a direct and proximate result of the Defendants' negligent acts and omissions, the Bank suffered damages in connection with the Bristol-originated loans.

142.     Each of the Defendants is liable to the FDIC-R for the damages incurred in connection with his tortious conduct relating to the Deficient Loans the Bank funded during the period that the Defendant had responsibility for the Bristol relationship, and other relief as more fully set forth in the Prayer for Relief.

### COUNT II – GROSS NEGLIGENCE UNDER FIRREA
#### (Against All Defendants)

143.     The FDIC-R realleges and incorporates by reference the allegations set forth in paragraphs 1 through 124 above.

144.     This is an action for damages against all Defendants under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, codified at 12 U.S.C. § 1821(k), *et seq*. ("FIRREA"), for their gross negligence as officers.

145.     Section 1821(k) of FIRREA holds bank directors and officers personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

146.     The Defendants' acts and omissions with respect to the Bristol relationship amounted to an utter disregard of prudence and complete neglect of the safety and soundness of the Bank's lending operations.  In light of the known risks of the Bristol relationship, their failure to exhibit even a slight degree of care or diligence constituted gross negligence of their duties to the Bank.

147.     Defendants allowed Bristol to exercise unchecked control over a substantial volume of the Bank's loan production and lending functions.  Most significantly, they turned a blind eye to regulators' warnings, the inherently risky structure of the Bristol relationship, growing CRA loan delinquencies and concentration levels, and other red flags, and continued to

allow the Bank to fund loans automatically upon Bristol's request, and took no steps to verify whether the loans complied with applicable loan policies before funding.

148.    Together with their continued failure to supervise the Bristol relationship as a whole, Defendants subjected the Bank to extreme risks.

149.    As a direct and proximate result of the Defendants' grossly negligent acts and omissions, the Bank suffered damages in connection with the Bristol-originated loans.

150.    Each of the Defendants is liable to the FDIC-R for the damages incurred in connection with his tortious conduct relating to the Deficient Loans the Bank funded during the period that Defendants had responsibility for the Bristol relationship, and other relief as more fully set forth in the Prayer for Relief.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

151.    The FDIC-R realleges and incorporates by reference the allegations set forth in paragraphs 1 through 124 above.

152.    This is an action for breach of fiduciary duty of care against all Defendants.

153.    As officers of the Bank, Defendants occupied a fiduciary relationship to the Bank, its shareholders, depositors, and others.  Therefore, they had a duty to act with the utmost good faith, with care, and in the best interests of the Bank.

154.    Defendants breached these fiduciary duties by failing to supervise, oversee, and monitor the Bank's relationship with Bristol and Bristol's underwriting of loans funded by the Bank.

155.    As a direct and proximate result of the Defendants' breaches of their respective fiduciary duties of care, the Bank suffered damages in connection with the Bristol-originated loans.

156.    Each of the Defendants is liable to the FDIC-R for the damages incurred in connection with his or her tortious conduct relating to the Deficient Loans the Bank funded during the period that Defendants had responsibility for the Bristol relationship, and other relief as more fully set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

The FDIC-R requests that the Court enter judgment on Counts I, II, and III granting the FDIC-R the following relief:

1.      Damages in an amount to be proven at trial (including appropriate interest under 12 U.S.C. § 1921(*l*)) against each Defendant for negligence, gross negligence, and breach of fiduciary duty in connection with their tortious conduct relating to each Deficient Loan that Ameribank funded during such Defendant's period of oversight responsibility for the Bristol relationship; and

2.      Pre- and post-judgment interest and litigation costs against all Defendants; and

3.      Such other relief the Court deems appropriate or necessary.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a jury trial in this case on all issues triable by jury.

Dated:  October 26, 2012.

Respectfully Submitted,

/s/Frederick J. Springer
Frederick J. Springer
Florida Bar No. 982164
Elizabeth W. Neiberger
Florida Bar No. 0070102
Bryant Miller Olive P.A.
101 North Monroe Street, Suite 900
Tallahassee, Florida  32301
Phone: (850) 222-8611

43

Fax: (850) 222-8969
Email: fspringer@bmolaw.com
Email: eneiberger@bmolaw.com

Michael F. Gibson
West Virginia Bar No. 1379
Gibson, Lefler & Associates
1345 Mercer Street
Princeton, West Virginia 24740
Phone: (304) 425-8276
Fax: (304) 487-1574
Email: gla@citlink.net

Attorneys for Plaintiff Federal
Deposit Insurance Corporation
as receiver for Ameribank, Inc.