UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT BLUEFIELD

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
AMERIBANK, INC.,

       Plaintiff,

v.                               Civil Action No. 1:12-7050

JACK A. BALDINI; DAVID G.
COGSWELL; LOUIS J. DUNHAM;
MICHAEL O'BRIEN; and
JAMES SUTTON,

       Defendants.


DEFENDANTS' DAVID G. COGSWELL,
LOUIS J. DUNHAM, AND MICHAEL O'BRIEN'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendants Lou Dunham, David Cogswell and Michael O'Brien have moved this Court to dismiss the Complaint filed by the Federal Deposit Insurance Corporation ("FDIC"), as receiver of Ameribank, for failure to state claims against them upon which relief can be granted.  As set forth below, the standard of liability in this matter is gross negligence.  Therefore, the FDIC's claims of negligence and breach of fiduciary duty based on negligence fail as a matter of law.  Further, based on the allegations of the Complaint and because the actions of the Dunham Group were both reviewed and ratified by the supervisory regulatory authorities during their tenure at Ameribank, the Complaint fails to allege sufficient facts to show a plausible claim for relief with respect to gross negligence and breach of fiduciary duty based on gross negligence claims.

I.      **Factual Background**

A.      **Overview of Complaint.**

The FDIC's Complaint asserts claims of negligence, gross negligence and breach of fiduciary duty against five former officers of Ameribank, all arising from Ameribank's relationship with a Florida-based third-party mortgage broker and loan originator, Bristol Home Mortgage Lending LLC ("Bristol").  Comp. ¶¶ 1 and 21.  All defendants are charged with "failing to provide meaningful oversight or control of Bristol's underwriting of the loans" and "permitt[ing] the Bank to fund Bristol-originated loans despite serious deficiencies."  *Id.* ¶ 3.  The Complaint cites specific examples of allegedly deficient loans funded between September 30, 2006 and September 30, 2007, *see id.* ¶¶ 93-124, and asserts a claim for resulting damages incurred by the Bank.  *Id.* ¶ 4.  Significantly, the Complaint only seeks damages incurred "during the period the Defendant had responsibility for the Bristol relationship."  *Id.* ¶¶ 142, 150, 156.

Although the Complaint collectively charges the defendants with the asserted wrongs, their respective responsibilities in managing and overseeing the Bristol relationship are temporally and geographically divided between two management groups:  Dunham, Cogswell and O'Brien on the one hand and Sutton and Baldini on the other hand.

In August 2003, Ameribank, a West Virginia bank, opened a Florida branch with the hiring of Lou Dunham as President of the Florida Branch.  *Id.* ¶ 31.  Dunham brought with him two colleagues as his management team in Florida:  David Cogswell as an Executive Vice President and Risk Officer and Michael O'Brien as a Senior Vice President and Collections Manager.  *Id.* ¶¶ 25-28.  This management team, referenced here as the Dunham Group, managed the relationship with Bristol from the inception of the Bristol Mortgage Loan Sale and Servicing Agreement ("MLSS

Agreement") in May 2004 until their departures: Dunham in early December 2006 and Cogswell and O'Brien in mid-January 2007. *Id.* ¶¶ 21-27, 63, 70. The one change of note during this period occurred when Dunham was named CEO of Ameribank on January 27, 2005. *Id.* ¶ 22. Even as CEO of Ameribank, Dunham remained in Florida along with Cogswell and O'Brien through their tenures with Ameribank. *Id.* ¶ 64.

With the departure of Dunham in December 2006, defendant James Sutton, the controlling shareholder of the Bank's holding company and a long time Board member and the Chairman of the Bank Board, assumed control of the Bank as Acting President on December 21, 2006. *Id.* ¶ 14-17. Although Sutton formally relinquished the title of President on January 18, 2007 to his fellow Board member, defendant Jack Baldini, the Complaint describes Sutton as functionally "the Bank's primary executive officer" from January 18, 2007 until October 9, 2007. *Id.*¶¶ 18-19, 72. The Complaint also describes Sutton as the one overarching constant in the Bristol relationship who was involved from the inception of the relationship in 2004, including negotiating the MLSS Agreement along with Dunham, through its termination in or about August 2007. *Id.*¶ 17. Notably, neither Sutton nor Baldini worked or resided in Florida; their management of the Bristol relationship was thus handled long distance. *Id.*¶ 64.

In its Complaint, the FDIC draws some important distinctions between the two management groups and makes some important concessions with respect to the Dunham Group's management of the Bristol relationship. The FDIC acknowledges that Dunham, Cogswell and O'Brien "performed all due diligence on Bristol before the MLSS was executed." *Id.* ¶ 40. The FDIC likewise acknowledges that the Dunham Group constituted the "core management team" who "were central to the Bank's relationship with Bristol" and had the "primary operational knowledge of the Bristol relationship." *Id.*¶¶ 48, 63. They regularly communicated with Bristol's officers and

advised Ameribank's Board of Directors "of the status of the relationship and use of the Bank's assets to fund Bristol loans." *Id.* ¶ 66.  Although the FDIC complains about the rapid growth in the Bristol portfolio, it concedes that "[m]uch of the growth occurred after the Dunham management team resigned." *Id.* ¶¶ 49-50.  Finally, the FDIC makes no allegation – in contrast to Sutton and Baldini – that internal concentration limits established at Ameribank for the Bristol portfolio were ever breached during the Dunham Group's tenure.  *See id.* ¶¶ 52, 71.

A very different picture is painted by the Complaint once Sutton and Baldini assume control in mid-December 2006.  The Complaint specifically alleges that Dunham, Cogswell and O'Brien were the "only senior officers in Florida" where Bristol was headquartered and the relationship was managed.  *Id.*¶¶ 21, 64.  Nonetheless, Sutton and Baldini failed to "replac[e] the Dunham team with capable management."  *Id.* ¶¶ 51, 70.  Instead, Sutton and Baldini "simply increased their day-to-day involvement with the Bank's affairs" even though they "were unqualified to oversee, manage and control the Bank's relationship with Bristol and Bristol's underwriting of CRA loans." *Id.* ¶ 51.  Significantly, it required a Cease and Desist Order issued by the Office of Thrift Supervision ("OTS") before Sutton and Baldini hired a qualified bank president in October 2007. *Id.* ¶ 71.  Sutton and Baldini never formally replaced Cogswell and O'Brien.  *Id.* ¶ 70.

Consistent with the lack of qualified management, the Complaint continues to describe the relationship with Bristol under Sutton and Baldini as essentially uncontrolled.  The Complaint specifically alleges that Sutton and Baldini "significantly expanded the CRA loan program operated by Bristol without regard to the obvious deterioration of Ameribank's CRA loan portfolio." *Id.* ¶ 47.

> Between June 2006 and April 2007, Ameribank experienced an 88.1 percent growth in CRA loans purchased from Bristol.  By May 31, 2007, the Bristol relationship represented 401 percent of tier 1 capital plus ALLL.
>
> *   *   *

Much of this growth occurred after the Dunham management team resigned. *Id.* ¶¶ 49-50.

As a result, the Bank's internal concentration limits, which were established to control the Bank's risks, were breached under Sutton and Baldini's leadership. *Id.* ¶¶ 52, 70. OTS accordingly issued on May 25, 2007, a Supervisory Directive requiring the Bank to cease funding any Bristol-originated loans as of August 31, 2007. *Id.* ¶ 88. Even this Directive was breached under Sutton and Baldini's leadership when another two allegedly deficient loans were funded in September 2007. *Id.* ¶ 61. Another Cease and Desist Order was accordingly issued on October 19, 2007, which imposed additional restrictions relating to the Bristol loans, including a prohibition on making any rehab loans *and* requiring a plan "to provide adequate staffing of the monitoring, review, control and workout of the Rehab-Related Assets." *Id.* ¶ 89, *see* October 19, 2007 Order to Cease and Desist at files.ots.treas.gov/enforcement/96310.pdf. Nine months after the departure of the Dunham Group, a government directive was required to compel the Bank to address the experience and manpower lost as a result of their departure.

**B.     The MLLS Agreement and Loans In Issue.**

As structured, the MLSS Agreement with Bristol "allowed Ameribank to enter into a new line of loan production in new geographic markets without incurring the overhead costs generally associated with starting or expanding a new business." *Id.* ¶ 32. In other words, the Agreement was intended to "allow the Bank to use Bristol's services to expand mortgage lending quickly and at low cost." *Id.*

The primary loans in issue are a niche-type of loan known as construction and rehabilitation account ("CRA") loans. These loans were short-term, 12-15 months, with an average principal balance of $105,000 and a balloon payment at the end. *Id.* ¶ 36. The loans were used to purchase, rehabilitate, and then resell homes. *Id.* The loans were subject to specific underwriting

standards, and Bristol was required to certify compliance with these standards before Ameribank would fund the loan. *Id.* ¶ 37. The Agreement thus did not contemplate Ameribank review of the loans prior to funding. However, Ameribank had the right to reject CRA loans offered by Bristol if the loans failed to meet Bristol's underwriting standards. *Id.* ¶ 55.

The CRA loans, by their nature, were higher risk loans which were very dependent upon the health of the real estate market. *Id.* ¶ 80. For this reason, "[p]roper due diligence, internal controls, approvals, quality control audits and ongoing monitoring were warranted for this high risk arrangement." *Id.* ¶ 35. The gravamen of the Complaint with respect to the Bristol loans is that:

> Despite regulators' repeated warnings, Defendants unreasonably relied on Bristol at every stage of the lending process, notwithstanding that *Bristol engaged in seriously deficient loan underwriting, administration, and approval practices* . . .

*Id.* ¶ 58 (emphasis added). Defendants are thus charged collectively with Bristol's failures based on the Complaint's allegations of:

- Defendants' respective failures to properly supervise the Bristol relationship, *id.* ¶¶ 131-135;

- Defendants' allowing loans to be funded without any review before funding, *id.* ¶ 138;

- Defendants' failure to enforce the Bank's rights under the MLSS Agreement, *id.* ¶ 140; and

- Turning "a blind eye to regulators' warnings, the inherently risky structure of the Bristol relationship, growing CRA loan delinquencies and concentration levels, and other red flags . . . ", *id.* ¶ 147.

As previously noted, the Complaint identifies "at least 32 deficient loans" that were funded on and after September 30, 2006, a mere two and one half months *before* Dunham's alleged departure and three and one half months *before* Cogswells' and O'Brien's departure. At least as to these defendants, the loans sued on were newly made and current when they departed and the time

frame for them to identify or work out any issues with respect to any particular loan – including requiring Bristol to take back the loan (per Ameribank's right to reject any loan if it failed to meet Bristol's underwriting standards, *see id.* ¶ 55) – was extremely narrow.  Further, because the Dunham Group left Ameribank, they lost any ability to control what happened with these post-September 30, 2006 loans if and to the extent any problems were identified.  This is the context in which the FDIC sues them for negligence, gross negligence and breach of fiduciary duty.

      **C.**      **OTS's Assessment of the Dunham Group.**

      The Complaint outlines various alleged warnings issued by OTS concerning the Bristol relationship between 2004 and 2007 and specifically refers to and relies upon the following OTS Reports of Examination (RoE"):

1. The 2004 Report of Examination, *id.*¶ 79;

2. The March 17, 2005 Report of Examination, *id.* ¶ 80;[1]

3. The September 21, 2005 Report of Examination, *id.* ¶ 83; and

4. The August 8, 2006 OTS Melded Limited Examination, *id.* ¶ 84.

Because the FDIC's reference to these RoEs is at best out of context and misleading, the full reports are attached to the defendants' Motion to Dismiss as Exhibits 1 to 4, respectively.  This Court may of course "consider documents attached to the Complaint . . . as well as those attached to the motion to dismiss, 'so long as they are integral to the complaint and authentic.'"  *Corbett v. Duerring*, 780 F. Supp. 2d 486, 492 (S.D.W. Va. 2011) (citing *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006)); *see also American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  In this case, the OTS RoEs are integral to the FDIC's Complaint and the Court should not close its eyes to the contents of those reports simply because the FDIC chose not to attach them

---

[1]The March 17, 2005 Report of Exam is in fact dated March 7, 2005.

to the Complaint.  *See Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991) (considered prospectus in addition to allegations in the complaint in determining if complaint stated a claim under Section 10(b) of the Securities Exchange Act of 1934 or Section 11 of the Securities Act of 1935 without converting motion into a motion for summary judgment because prospectus was integral to the complaint even though complaint plaintiff did not attach prospectus and the complaint only quoted prospectus in a limited fashion.).  Finally, in cases such as this, where there is a conflict between the complaint allegations and what is contained in the exhibits, the exhibits prevail.  *See  Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)(internal citations omitted).

The April 12, 2004 RoE was the first regular OTS examination after the opening of the Florida branch.  *See* Ex. 1.  No issues were noted with respect to the Bristol loan portfolio.  While OTS found the opening of the Florida bank "slightly" increased risk, it also found the "new bank is well managed and proper controls are in place."  *Id.* ¶ 1.  Finally, with respect to the Dunham Group, OTS wrote:

> [t]he management team at the branch brings a wealth of experience to Ameribank and complements the existing management well.  While a few minor recommendations were made (see Asset Quality), management appears stronger and provides an excellent foundation to build upon."  *Id.* at p. 11.

The Bank was given a CAMELS rating of 2.[2]

On March 7, 2005, OTS conducted another field visit to the Florida branch.  In its RoE of that visit, it wrote that loan underwriting "continues to be innovative but thorough."  *See* Ex. 2, p. 2. With regard to the Bristol loan portfolio in particular, while OTS noted "elevated risks presented by

---

[2]CAMELS is a ratings system used by the government to assess the overall strength of a bank.  Banks are rated on a scale of 1 to 5, with 1 being the strongest and 5 being the weakest.  The components of the system are **C**apital Adequacy, **A**sset Quality Management, **E**arnings, **L**iquidity, and **S**ensitivity to Market Risk.  In the April, 2004 exam, Ameribank received a CAMERLS Rating of 2 (overall)/222311, indicating it was a strong Bank.  *See* Ex. 1, p.1.

the various aspects and characteristics of the Bristol program…," it found that "**the bank's system does contain numerous controls governing and tracking the underwriting and renovation processes**." *Id*. at 6.   OTS did recommend that the Bank's Board "consider" some in-house limitations, either as a percent of capital or percent of assets, on the assets invested with Bristol.  *Id*. at 6.  In response to this recommendation, the Bank adopted concentration limits for the Bristol portfolio.  *See* Ex. 3, p. 15.

Four months later, OTS conducted another regular comprehensive examination and review of Bank operations between July 5, 2005 and August 24, 2005, the first after Dunham became CEO of the entire bank.  In its RoE dated September 21, 2005, OTS again blessed the Dunham Group's management.  Ameribank again received a favorable overall CAMELS rating of 2. The individual CAMELS component ratings were 2,2,1,2,1,1, an improvement over the component ratings issued in the 2004 regular exam, again indicating strong, responsive Bank management. *See* Ex. 3, p. 1; Ex. 1, p. 1.  As part of this examination, OTS conducted an extensive loan review, after which it "reiterated the strong quality of the loan portfolio and management's expertise within their market and in diverse nonhomogeneous products."  Ex. 3, p. 9.  It further noted lending operations were governed by "conservative standards" and that management had "effectively managed the credits thus far…" *Id*. at 8.

During this comprehensive exam, OTS actually went with Mr. Dunham to Bristol's headquarters in Boca Raton and met extensively with Bristol management. As a result of this visit, OTS had a much greater "comfort level regarding [Bristol], its managers, and operations."  *Id*. at 12. It found the Dunham Group had a "strong body of operating policies, procedures, and risk identification/control functions" that it had instituted in Florida and then spread across all Bank operations.  *Id*. at 14.  Specifically discussing the Bristol loan concentration, OTS again noted that

in-house concentration limits had been approved (following OTS's recommendation in its March 7, 2005 report), and that the portfolio showed "strong growth and increased profitability." *Id*. at 40-41.

Finally, in its August 8, 2006 report of its Melded Limited Exam, which was the last OTS visit prior to the Dunham Group leaving Ameribank, OTS again reviewed and blessed the Bristol relationship. It again found "overall operating performance to be strong" and noted "[a]sset quality is also strong. Delinquent loans, classified assets and charge-offs remain low and very manageable." Ex. 4, p. 1. With regard to Bristol, OTS determined "controls established by management **provide for appropriate monitoring and oversight of the bank's higher risk loans.**" *Id*. at 3 (emphasis added). OTS also conducted a random sample review of Ameribank's Bristol loans and found ample information available in the loan files and effective monitoring of the loans. The examiners also noted that Cogswell and O'Brien "performed further review of 31 relationships in June 2006." No exceptions were found in this review, and in all instances "underwriting was consistent with established standards." *Id.* at 3-4. OTS concluded that "[o]ur FV review yielded **no material concerns that would require a written response on the part of management and the board.**" *Id*. at 14 (emphasis added).

Contrary to the Complaint allegations, OTS, on four separate occasions in the two-and-a-half year period between April, 2004 and August, 2006, found the Dunham Group's management and oversight of the Bristol portfolio to be effective and appropriate. OTS even complimented Ameribank for increasing the amount of loans as a percentage of total assets, touting that as an improvement of a key indicator of profitability. *Id*. at p. 6.

## II.     Legal Standard

To survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007)).  Once a claim has been adequately stated, it may be supported by showing any set of facts "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Legal conclusions in a Complaint must be supported by factual allegations.  When there are well-pleaded factual allegations, the Court should assume their veracity and determine whether they "plausibly give rise to an entitlement to relief."  *Id.* 556 U.S. at 679, 129 S. Ct. at 1950.  If the Complaint does not state a plausible claim for relief, but only allows an inference of a "mere possibility," the Complaint has failed to show the pleader is entitled to relief, and the Complaint should be dismissed.  *Id.*

**III.    Argument**

**A.    Because Gross Negligence Is the Applicable Standard of Liability In This Case, the FDIC's Claims Based on Negligence and Breach of Fiduciary Duty Must Be Dismissed.**

*1.    Florida Law Is the Applicable Law.*

The Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") provides that, in an action brought by the FDIC as receiver, a director or officer may be held personally liable for monetary damages based upon:

> . . . gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law.  Nothing in this paragraph shall impair or affect any right of the Corporation under other applicable law.

12 U.S.C.A. § 1821(k).  This statute provides a minimum standard of liability.  If state law provides a stricter standard, such as simple negligence, state law applies.  *See Atherton v. F.D.I.C.*, 519 U.S. 213, 216, 117 S. Ct. 666, 669 (1997).

Applicable state law must accordingly be determined to assess whether a standard stricter than gross negligence should apply.   The Restatement (Second) of Conflicts speaks directly to directors' and officers' liability and provides:

> The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, **except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.**

Restatement (Second) of Conflict of Laws § 309 (1971) (emphasis added).

Section 6 of the Restatement sets forth the following factors to be used in resolving choice of law issues:

> (1)      A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

> (2)      When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

> (a)       the needs of the interstate and international systems,

> (b)       the relevant policies of the forum,

> (c)       the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

> (d)       the protection of justified expectations,

> (e)       the basic policies underlying the particular field of law,

> (f)       certainty, predictability and uniformity of result, and

> (g)       ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6.

Section 145 of the Restatement provides that, when applying Section 6, the following additional factors should be considered in the choice of law analysis:

(2)       Contacts to be taken into account in applying the principals of § 6 to determine the law applicable to an issue include:

(a)       the place where the injury occurred,

(b)       the place where the conduct causing the injury occurred,

(c)       the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d)       the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145(2).

In this case, although Ameribank is a West Virginia bank, the relationship involving Bristol was unquestionably centered in Florida. Bristol was headquartered in Florida and the relationship with Bristol was managed in Florida; the MLSS agreement was formed in Florida; and the purpose of the MLSS Agreement was to stimulate asset growth in the Florida market through increased lending. *Id.* ¶¶ 21, 31-32, 64. Indeed, but for the Florida branch of Ameribank, where the Dunham Group worked and resided, no MLSS Agreement would ever have been struck with Bristol.

Moreover, under the relevant policies of the West Virginia forum, one of the Restatement Section 6 factors, West Virginia would look to Florida law under its choice of law rules.[3] With regard to negligence cases, West Virginia applies the rule of *lex loci delicti* ("place of the wrong"). *See Vass v. Volvo Trucks N. Am., Inc.*, 315 F. Supp. 2d 815, 817 (S.D.W. Va. 2004); Syl. Pt. 1, *Paul v. National Life*, 352 S.E.2d 550 (W. Va. 1986). Under this principle, application of Florida law to the FDIC's claims is required.

---

[3] Since liability in this matter requires reference to state law, state law choice of law rules should apply. *See e.g., In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205-206 (4th Cir. 1998) (applying state choice of law rules in bankruptcy proceeding when federal law incorporates matters which are the subject of state law.); *see also In re Janssens*, 449 B.R. 42, 67 (Bankr. D. Md. 2010) (federal courts apply choice of law of forum where it sits); *Carlucci v. Han*, 2012 WL 3242618, *5, n.4, ____ F. Supp. 2d ____ (E.D. Va. Aug. 7, 2012) (applying law of forum where court sits in securities action for violation of Section 10(b) of the Securities and Exchange Act.)

Thus, under both West Virginia law and the Restatement analysis, Florida law applies.

2.        *Directors and Officers are Not Liable For Simple Negligence Under Florida Law.*

Florida applies a gross negligence standard to directors' and officers' liability.  Prior to 1987, Florida applied a simple negligence standard of liability for directors and officers.  *See F.D.I.C. v. Stahl*, 89 F.3d 1510, 1516 (11th Cir. 1996).  However, in 1987 Florida law was amended and liability for directors and officers was imposed only for acts constituting "more than gross negligence."  *F.D.I.C. v. Gonzalez-Gorrondona*, 833 F. Supp. 1545, 1556 (S.D. Fla. 1993).  The *Gonzales-Gorrondona* Court, relying on Fla. Stat. §607.0830 and §607.0831, held that the "Florida statute insulates corporate directors and officers from conduct amounting to gross negligence, and permits liability only for greater derelictions of the duty of care."  *Id.*  However, because the "more than gross negligence standard" is more lenient than the gross negligence standard in 12 U.S.C. §1821(k), liability of directors and officers under Florida law must be scrutinized by a gross negligence standard.  *Id.* at 1559.  In addition to this statutory standard, under Florida common law, directors and officers are liable only for gross negligence pursuant to the business judgment rule.  *See Int'l Ins. Co. v. Johns*, 685 F. Supp. 1230, 1237-38 (S.D. Fla. 1988) (*aff'd*, 874 F.2d 1447 (11th Cir. 1989)(holding under Florida's business judgment rule, directors and officers are only liable when they act fraudulently, illegally, oppressively or in bad faith.); *see also F.D.I.C. v. Mintz*, 816 F. Supp. 1541, 1546 (S.D. Fla. 1993)(*disagreed with* by *FDIC v. Stahl*, 89 F.3d 1510(11th Cir. 1996)).[4]

Because liability for the Dunham Group must be assessed under a gross negligence standard, the FDIC, as a matter of law, has failed to state a claim against the Dunham Group for negligence. Further, because the FDIC's claim for breach of fiduciary duty is essentially a restatement of the

---

[4]The disagreement recognized in *Stahl* dealt with the application of the threshold requirement of ordinary care under Fla.Stat.§ 607.111, which prior to 1987 imposed an ordinary negligence standard for liability for directors and officers.  *See Stahl*, 89 F.3d. at 1516.  However, as stated in section A.2, *supra* after 1987 Florida law was amended to impose a more than gross negligence standard for directors' and officers' liability. Thus, the disagreement recognized in *Stahl* does not apply to the case at bar.

FDIC's negligence claim (alleged breach based upon the failure to supervise, oversee and monitor the Bristol relationship), the breach of fiduciary duty claim should be dismissed as well. (*See* Compl. ¶ 154); *see also Gonzales-Gorrondona*, 833 F. Supp. at 1559-1560 (striking breach of fiduciary claims that are mere restatements of negligence claims.); *FDIC v. Skow, et al.*, Case No. 1:11-cv-00111-SCJ, Doc. #84, pp. 18-19(N.D Ga., Feb. 27, 2012)(holding gross negligence standard applies to director and officer liability under Georgia law and dismissing negligence and breach of fiduciary duty claims based on negligence.)[5]  As such, the Court must dismiss Count I (Negligence) and Count III (Breach of Fiduciary Duty) of the FDIC's Complaint.

**B.     The FDIC has Failed to State a Claim for Gross Negligence Upon Which Relief Can be Granted as to the Dunham Group.**

The FDIC has also failed to state a claim under Florida law for gross negligence against the Dunham Group.  There is no national standard for gross negligence under FIRREA; state law must accordingly be looked to for determining what constitutes gross negligence.  *See FDIC v. Canfield*, 967 F.2d 443, 447 (10th Cir. 1994).

Gross negligence under Florida law has been defined as that act or omission which a reasonable, prudent man 'would know would probably and most likely', result in an injury to another; and, from a standpoint of degree, it is clear that gross negligence lies between simple negligence and the 'wilful and wanton' conduct sufficient, if death results, to constitute 'culpable negligence' within the crime of manslaughter." *Glaab v. Caudill*, 236 So. 2d 180, 182 (Fla. Dist. Ct. App. 1970)(emphasis added); *see also Jones v. Robinson*, 618 So. 2d 279, 280 (Fla. Dist. Ct. App. 1993)("gross negligence is that act or omission which a reasonably prudent person would know would probably and most likely result in an injury to another.)(citing *Glaab*); *Fla.Stat.Ann*. §768.72(b)(statutory provision dealing with availability of punitive damages defining gross

---

[5]The United States District Court for the Northern District of Georgia's Order in *Skow* is attached to the Motion to Dismiss as **Exhibit 5.**

negligence as conduct "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety or rights of persons exposed to such conduct."). Further, under the business judgment rule, "a court presumes that corporate directors acted in good faith. . . . The rule prevents a court – which may possess less business expertise than the corporate directors – from calling upon directors to account for their actions, no matter how poor their business judgment, absent a showing by the plaintiff of abuse of discretion, fraud, bad faith, or illegality. *Kloha v. Duda*, 246 F. Supp. 2d 1237, 1244 (M.D. Fla. 2003)(citing *Bal Harbour Club*, 316 F.3d 1192, 1194-1195 (11th Cir. 2003). The FDIC's Complaint fails to make this showing.

The FDIC's claim of gross negligence against the Dunham Group is premised on allegations that they "allowed Bristol to exercise unchecked control over a substantial volume of the Bank's loan production and lending functions," and otherwise exhibited "utter disregard of prudence" and "complete neglect" of the soundness of the Bank's lending operations vis-a-vis Bristol. Comp. ¶¶146-147. The claim of gross negligence is further premised on allegations that the Dunham Group "turned a blind eye to the regulators' warnings, the inherently risky structure of the Bristol relationship, growing CRA loan delinquencies and concentration levels, and other red flags . . . ." *Id.* at ¶148.

However, with respect to the Dunham Group, these allegations are conclusory legal statements that are not supported by factual allegations showing a plausible entitlement to relief. *See Ashcroft v. Iqbal*, 556 U.S.at 678, 129 S. Ct. at 1949. The RoEs relied upon by the FDIC in its Complaint, as well as the allegations of the Complaint, belie any claim of gross negligence.

Multiple times during the Dunham Group's tenure between 2004 and 2006, examiners reviewed and approved the Group's management practices and skill set and the issues surrounding the Bristol portfolio. Through the examiners' August 2006 report, examiners consistently found the

Bank "well-managed and proper controls in place."  "E.g., Ex. 1, p. 1.  And although OTS noted in 2005 "elevated risks" associated with the Bristol program, it found that the Bank's system "contains numerous controls governing and tracking the underwriting and renovation processes."  Ex. 2, p. 6.  This finding was reiterated as late as August 2006 with respect to Bristol:  "controls established by management provide for appropriate monitoring and oversight of the bank's higher risk loans."  Ex. 4, p. 3.  OTS even conducted a random sample review of the Bristol loans in this 2006 visit and found ample information available in the loan files and effective monitoring of the loans.  Ex. 3, p.3-4.

The FDIC impliedly concedes in its Complaint the competence of the Dunham Group by faulting defendants Sutton and Baldini for failing to replace any of the Dunham Group with capable management.  Complaint ¶ 51, 70.  Sutton and Baldini, per the allegations of the Complaint, simply were not qualified "to oversee, manage and control the Bank's relationship with Bristol and Bristol's underwriting of CRA loans."  *Id.*  This contrast in management skills is further documented in the Complaint:  concentration limits were adhered to in the Dunham Group's tenure and "much of the growth" in the Bristol portfolio occurred after the Dunham Group resigned.  *Id.*¶ 49-50, 52-71.  Indeed, the Complaint alleges that "Sutton and Baldini significantly expanded the CRA loan program operated by Bristol without regard to the then obvious deterioration of Ameribank's CRA loan portfolio."  *Id.* ¶ 47.  This specific claim concerning the obvious deterioration in the CRA loan portfolio is made as to Sutton and Baldini only, not the Dunham Group.

These facts and allegations do not support the claim of an "utter disregard of prudence" or a "complete neglect of the safety and soundness of the Bank's lending operations" on the part of the Dunham Group.  *See Id.* at ¶146.  They do not show that the Dunham Group turned a "blind eye" to OTS warnings and recommendations.  In fact, they show the opposite.  The Dunham Group

specifically adopted internal concentration limits on the Bristol portfolio, *see* Ex. 3; and though they did intend to increase those limits, OTS was aware of this plan and voiced no objection to it in its August, 2006 RoE.  *See* Ex. 5, p. 3 (noting "management anticipates increasing the current board approved limit from 30.0 percent to 35.0 percent of total assets in the near future.").  OTS was closely watching the Bristol portfolio and, though it recognized the higher risk nature of the portfolio, was satisfied with the Dunham Group's management of that risk.  Conversely, it was not until the Dunham Group left and was not replaced that the pace of the lending was "significantly expanded" and the internal limits exceeded.

Cases where gross negligence claims have proceeded have involved conduct much different than that of the Dunham Group.  In *FDIC ex. re. Wheatland Bank v. Spangler*, 836, F.Supp.2d, 778 (N.D. Ill. 2011), a complaint was brought against members of the board of directors of the bank and the loan committee.  The allegations generally were that, despite early and repeated warnings from regulators about excessive growth, the bank continued to pursue asset growth, increased concentrations of high risk loans, and had numerous uncorrected underwriting failures.  *Id*. at 783.  With regard to the loan committee, it was alleged that bank's growth strategy violated its regulator approved growth plan; and by the end of its second year in operation, the bank had extended $401 million in loans, which was five times the regulator approved loan limit.  *Id*.  These allegations, and the defendants' continued disregard of those warnings, were sufficient to state a claim for gross negligence.  *Id*. at 189-790.

No such claims are made here.  The RoEs referenced in the Complaint applauded the increased profitability brought about by the Florida branch's lending policy, approved of the Dunham Group's oversight of Bristol loans, and blessed the relationship. They indicate that management followed OTS recommendations in adopting concentration limits (which were not

exceeded until after the Dunham Group left the Bank).   Finally, they indicate that OTS itself reviewed Bristol loans in 2006 and found no problem with the loans.

*FDIC v. Jackson*, 133 F.3d 694 (9th Cir. 1998), also allowed gross negligence claims to proceed against the board of directors of a bank based on conduct that occurred over the course of eight years, from 1981 to 1989.   During that time, yearly examinations of the bank "repeatedly identified deficiencies in lending practices, including poor loan documentation, inadequate loss reserves, and inadequate commercial loan supervision," all of which were presented to the bank Board.   *Id.* at 696.   In addition, the examinations resulted in "two memoranda of understanding between the regulators and the bank directors and two cease and desist orders."   *Id*.   This history, involving the bank's "continued failure to adhere to regulations and regulatory directives, resulting in numerous regulatory enforcement actions," was deemed sufficient by the 9th Circuit to support a claim of gross negligence.   *Id*. at 701 (internal citations omitted)[6].

In contrast, the actions of the Dunham Group were ratified and approved by OTS during their tenure.   No enforcement actions were initiated against the Bank and, rather than ignore or disregard regulator's warnings, the Dunham Group responded appropriately.   Moreover, the loans for which the FDIC seeks to recover against the Dunham Group were not even made until the final 2½ to 3½ months of the Group's tenure at Ameribank.   *See* Complaint ¶¶ 93-104.   No allegation is made that any of these loans were in default during that period or that these defendants knew or were aware of the specific deficiencies alleged.   Given the very narrow time frame in which these loans were on the books of Ameribank before the Dunham Group departed, the FDIC's claim of gross negligence lacks all plausibility.

---

[6] The gross negligence claims in *Jackson* proceeded against a single director, Henry Cavanagh, who had been on the board during most of the time frame at issue. The FDIC had previously stipulated that other directors who were on the board for a short period of time were protected by the business judgment rule and were not grossly negligent.

No liability can be found against the Dunham Group under Florida law's gross negligence standard and the business judgment rule "absent a showing by the plaintiff of abuse of discretion, fraud, bad faith, or illegality. *Kloha*, 246 F. Supp. 2d at 1244. Here, the allegations against the Dunham Group related to gross negligence are nothing more than conclusory legal allegations. When examined in light of the specific factual allegations in the Complaint and in light of the actual findings of OTS in its RoEs, it is clear that the Complaint lacks sufficient factual allegations to state a plausible claim for gross negligence. As such, the FDIC's claims for gross negligence and breach of fiduciary duty claims based upon gross negligence as to the Dunham Group must be dismissed.

**IV.** <u>Conclusion</u>

WHEREFORE, for the reasons set forth above, Defendants Louis J. Dunham, David G. Cogswell, and Michael O'Brien respectfully request that this Court dismiss each of the claims asserted against them – negligence, gross negligence, and breach of fiduciary duty – for failure to state a claim upon which relief can be granted.

> LOUIS J. DUNHAM, DAVID G. COGSWELL, and MICHAEL O'BRIEN,
>
> By Counsel,

/s/ Rebecca A. Betts
Rebecca Betts, Esq. (WV State Bar No. 329)
John D. Hoblitzell III, Esq. (WV State Bar No. 9346)
Kay Casto and Chaney PLLC
P.O. Box 2031
Charleston, WV 25327-2031
telephone: (304) 345-8900
facsimile: (304) 345-8909
*Counsel for Louis J. Dunham, David C. Cogswell, and Michael O'Brien*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
AMERIBANK, INC.

      Plaintiff,

v.                                   Civil Action No. 1:12-7050

JACK A. BALDINI; DAVID G.
COGSWELL; LOUIS J. DUNHAM;
MICHAEL O'BRIEN; and
JAMES SUTTON,

      Defendants

## CERTIFICATE OF SERVICE

I, Rebecca A. Betts, do hereby certify that on this **14ᵗʰ** day of **January, 2013**, I electronically filed the forgoing **"DEFENDANTS' DAVID G. COGSWELL, LOUIS J. DUNHAM, AND MICHAEL O'BRIEN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS"** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Michael F. Gibson, Esq. (WV State Bar No. 1379)
Gibson, Lefler & Associates
1345 Mercer Street
Princeton, WV 24740
telephone: (304) 425-8276
facsimile: (304) 487-1574
gla@citlink.net
*Counsel for Plaintiff*

*and*

Frederick J. Springer, Esq. (FL. State Bar No. 982164)
Elizabeth W. Neiberger, Esq. (FL. State Bar No. 0070102)
Bryant Miller Oliver, P.A.
101 N. Monroe Street, Suite 900
Tallahassee, FL 32301
telephone: (850) 222-8611
facsimile (850) 222-8969
fspringer@bmolaw.com
eneiberger@bmolaw.com
*Counsel for Plaintiff*

Michael W. Carey, Esq. (WV State Bar No. 635)
Carey, Scott & Douglas, PLLC
P.O. Box 913
Charleston, WV 25323-0913
telephone: (304) 345-1234
facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
*Counsel for James M. Sutton*

*and*

Matthew P. Bosher, Esq. (VA State Bar No. 75894)
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
telephone: (804) 788-8200
facsimile: (804) 788-8218
mbosher@hunton.com
*Counsel for James M. Sutton*

Floyd E. Boone, Jr. Esq. (WV State Bar No.  8784)
Julia A. Chincheck, Esq. (WV State Bar No. 718)
J. Mark Adkins, Esq. (WV State Bar No. 7414)
Bowles Rice LLP
P.O. Box 1386
Charleston, WV 25325-1386
telephone: (304) 347-1100
facsimile: (304) 343-2867
fboone@bowlesrice.com
jchincheck@bowlesrice.com
madkins@bowlesrice.com
*Counsel for Jack A. Baldini*


/s/Rebecca Betts, Esq.
Rebecca Betts, Esq. (WVSB No. 329)
John D. Hoblitzell III, Esq. (WVSB No. 9346)
Kay Casto and Chaney PLLC
P.O. Box 2031
Charleston, WV 25327-2031
telephone: (304) 345-8900
facsimile: (304) 345-8909
*Counsel for Louis J. Dunham, David G. Cogswell,
and Michael O'Brien*