IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
AMERIBANK, INC.

    Plaintiff,

v.                      CIVIL ACTION NO. 1:12-7050

JACK A. BALDINI, et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

By Judgment Order dated September 30, 2013, the court **DENIED** defendants' motions to dismiss.  (Doc. Nos. 21, 24, and 26).  The reasons for that decision follow.

## I.  Background

Ameribank, Inc. ("Ameribank" or "the Bank") was a federally chartered savings bank with headquarters in West Virginia. Complaint ¶ 8. On September 19, 2008, the Office of Thrift Supervision closed Ameribank and appointed the FDIC as Receiver. Id. at ¶ 9.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(I), the FDIC, as receiver, succeeded to all the rights, titles, and privileges of Ameribank and its stockholders, account holders, and depositors.  Id.

According to the complaint, the allegations of which are taken as true for purposes of this motion, the closure of Ameribank was the result of a failure on the part of the Bank's officers to properly supervise and manage the Bank's relationship

with Bristol Home Mortgage Lending, LLC, d.b.a. LendingOne
("Bristol").  <u>See</u> Complaint generally.  Bristol was a third-party
mortgage broker and loan originator.  Complaint ¶ 1.

     The complaint alleges that Ameribank entered into an
agreement with Bristol in May of 2004 as part of an effort to
expand the bank's market and loan profile.  <u>Id.</u> at ¶¶ 31-32.
Specifically, the parties entered into a Mortgage Loan Sale and
Servicing Agreement ("MLSS Agreement") under which Ameribank was
required to fund all construction and rehabilitation account
("CRA") loans presented to it by Bristol.  <u>Id.</u> at ¶ 33.
According to the terms of the agreement, loans would be approved
as long as they conformed to Bristol's policies and underwriting
standards.  <u>Id.</u>  However, in many situations, Ameribank funded
loans without getting certification from Bristol that the loan
met Bristol's underwriting standards.  <u>Id.</u> at ¶ 37.  Ameribank
"allowed Bristol to exercise unfettered and unsupervised control
over the underwriting . . . and the Bank supplied the funds
without further analysis by Defendants as required by safe and
sound lending practices."  <u>Id.</u> at ¶ 2.  Its role in funding
Bristol-originated loans was limited to signing and returning
Bristol's Request for Preliminary Approval of Purchase of Loan
form.  <u>Id.</u> at ¶ 56.  The complaint further alleges that Ameribank
frequently funded the loans without signing this document and

that none of the named defendants required the document to be signed before providing the requested loan funds.  Id. at ¶ 57.

The gist of the complaint is that, given the high-risk nature of the loans involved and the amount of control given to Bristol, defendants had a duty to exercise due diligence and implement internal controls and ongoing monitoring to ensure the security of the Bristol-originated loans.  See id. at ¶ 35. According to the FDIC, defendants could not in good faith delegate entirely the duty to ensure the safety of these loans to Bristol.  Id. at ¶ 3.  As a result of the defendants' alleged negligent oversight, the FDIC charges that the Defendants allowed the Bank to fund Bristol-originated loans in violation of:  (1) the MLSS agreement between Bristol and Ameribank, (2) Bristol's loan policies, (3) Ameribank's loan policies, (4) applicable underwriting requirements, and (5) prudent lending practices. Id.

Defendants were former officers and, in some cases directors, with Ameribank.  They are sued, however, only in their capacity as officers.  Defendant James Sutton was Acting President of the Bank from December 21, 2006, until January 18, 2007.  Id. at ¶ 16.  The complaint further alleges that Sutton "functioned as the Bank's primary executive officer" from January 18, 2007, until October 9, 2007.  Id. at ¶ 18.  Defendant Jack A. Baldini was interim President of Ameribank from January 18, 2007,

3

through October 9, 2007.  Id. at ¶ 19.  According to the
complaint, "[u]nder Baldini's and Sutton's joint leadership, the
number of Bristol-originated loans funded by Ameribank
dramatically increased. . . ."  Id. at ¶ 20.

Louis J. Dunham was the President and CEO of the Bank from
January 27, 2005, to on or about December 15, 2006.  Id. at ¶ 22.
Dunham also served as the Bank's Florida Branch President from
May 2003 to January 27, 2005.  Id.  David G. Cogswell was
Ameribank's Executive Vice President ("EVP") and Chief Risk
Officer ("CRO") from May 2003 until his resignation on January
18, 2007.  Id. at ¶ 25.  The complaint further alleges that
Cogswell performed the duties of the Chief Financial Officer
("CFO") during that same time period.  Id.  Michael O'Brien was
the Senior Vice President ("SVP") and Collections Manager ("CM")
for the Bank from May 2003 until January 18, 2007.  Id. at  ¶
27.

In this case, the FDIC claims that defendants' conduct as
alleged in the complaint rose to the level of negligence, gross
negligence, and a breach of fiduciary duty.  The FDIC, therefore,
seeks to recover compensatory and other damages suffered by it as
the result of the Bank funding Bristol-originated loans without
proper supervision or independent review.  Id. at ¶ 4.

Pending before the court are individual motions to dismiss
by defendants Baldini and Sutton and a joint motion to dismiss by

4

defendants Dunham, Cogswell, and O'Brien (hereinafter referred to as "Dunham defendants" or "Dunham motion").  The FDIC filed a consolidated memorandum in opposition to the motions to dismiss and all defendants have filed reply briefs.

## II.  Standard of Review

"[A] motion to dismiss for failure to state a claim for relief should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim."  Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989) (citation omitted) (quoting Conley v. Gibson, 355 U.S. 41, 48 (1957), and Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir. 1969)).  "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff."  Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Ibarra v. United States, 120 F.3d 474, 474 (4th Cir. 1997).

In evaluating the sufficiency of a pleading, the cases of Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), provide guidance.  When reviewing a motion to dismiss, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted, a court must determine whether the factual allegations

contained in the complaint "give the defendant fair notice of
what the . . . claim is and the grounds upon which it rests,"
and, when accepted as true, "raise a right to relief above the
speculative level." Twombly, 550 U.S. at 555 (quoting Conley v.
Gibson, 355 U.S. 41, 47 (1957); 5 Charles Alan Wright & Arthur R.
Miller, Federal Practice and Procedure § 1216 (3d ed. 2004)).
"[O]nce a claim has been stated adequately, it may be supported
by showing any set of facts consistent with the allegations in
the complaint." Twombly, 127 S. Ct. at 1969. As the Fourth
Circuit has explained, "to withstand a motion to dismiss, a
complaint must allege 'enough facts to state a claim to relief
that is plausible on its face.'" Painter's Mill Grille, LLC v.
Brown, 716 F.3d 342, 350 (4th Cir. 2013) (quoting Twombly, 550
U.S. at 570).

        According to Iqbal and the interpretation given it by our
appeals court,

                [L]egal conclusions, elements of a cause of
                action, and bare assertions devoid of further
                factual enhancement fail to constitute
                well-pled facts for Rule 12(b)(6) purposes.
                See Iqbal, 129 S.Ct. at 1949. We also decline
                to consider "unwarranted inferences,
                unreasonable conclusions, or arguments."
                Wahi v. Charleston Area Med. Ctr., Inc., 562
                F.3d 599, 615 n. 26 (4th Cir. 2009); see also
                Iqbal, 129 S. Ct. at 1951-52.

                Ultimately, a complaint must contain
                "sufficient factual matter, accepted as true,
                to 'state a claim to relief that is plausible
                on its face.'" Iqbal, 129 S.Ct. at 1949
                (quoting Bell Atl. Corp. v. Twombly, 550 U.S.

6

544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929
(2007)). Facial plausibility is established
once the factual content of a complaint
"allows the court to draw the reasonable
inference that the defendant is liable for
the misconduct alleged." Id. In other
words, the complaint's factual allegations
must produce an inference of liability strong
enough to nudge the plaintiff's claims
"'across the line from conceivable to
plausible.'" Id. at 1952 (quoting Twombly,
550 U.S. at 570, 127 S.Ct. 1955).

Satisfying this "context-specific" test does
not require "detailed factual allegations."
Id. at 1949-50 (quotations omitted). The
complaint must, however, plead sufficient
facts to allow a court, drawing on "judicial
experience and common sense," to infer "more
than the mere possibility of misconduct."
Id. at 1950. Without such "heft," id. at
1947, the plaintiff's claims cannot establish
a valid entitlement to relief, as facts that
are "merely consistent with a defendant's
liability," id. at 1949, fail to nudge claims
"across the line from conceivable to
plausible." Id. at 1951.

Nemet Chevrolet, LTD v. Consumeraffairs.com, Inc., 591 F.3d 250,

255-56 (4th Cir. 2009).

### III.  Analysis

A.  *Choice of Law*

While all the other parties have argued for the application

of West Virginia law to this case, the Dunham defendants contend

that this court should apply Florida law.  Both the FDIC and the

Dunham defendants do agree, however, that the internal affairs

doctrine should guide the court's decision in this regard.

The internal affairs doctrine is "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs - - matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders - — because otherwise a corporation could be faced with conflicting demands." Edgar v. MITE Corp., 457 U.S. 624, 645 (1982) (citing Restatement (Second) of Conflict of Laws § 302, Comment b, pp. 307–08 (1971)).  The internal affairs doctrine states that "[t]he local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 302(2).  In Atherton v. FDIC, 519 U.S. 213 (1997), the Supreme Court "tacitly approved the application of the internal affairs doctrine in suits by the FDIC as receiver for a federally chartered bank against former officers and directors for negligence and breach of fiduciary duty." FDIC v. Van Dellen, No. CV 10-4915 DSF (Shx), 2012 WL 4815159, *3 (C.D. Cal. Oct. 5, 2012).  According to the Atherton court,

> In the absence of a governing federal common law, courts applying the internal affairs doctrine could find . . . that the State closest analogically to the State of incorporation of an ordinary business is the

>State in which the federally chartered bank has its
>main office or maintains its principal place of
>business.

Atherton, 519 U.S. at 224 (citations omitted).

"Few, if any, claims are more central to a corporation's
internal affairs than those relating to alleged breaches of
fiduciary duties by a corporation's directors and officers."  In
re Fedders North America, Inc., 405 B.R. 527, 539 (Bankr. D. Del.
2009); see also Fry v. Trump, 681 F.Supp. 252, 255–56 (D.N.J.
1988) ("Claims involving the 'internal affairs' of corporations,
such as breach of fiduciary duty and the like, are subject to the
laws of the state of incorporation.").  Accordingly, unless some
other state - - in this case, Florida - - has a more significant
relationship to the events underlying the FDIC's claims and the
parties, this court should apply West Virginia law.

Section 6 of the Restatement (Second) of Conflict of Laws
offers for consideration a number of factors in identifying the
state with the most significant relationship, including:

>(a)  the needs of the interstate and international
>     systems,
>
>(b)  the relevant policies of the forum,
>
>(c)  the relevant policies of other interested states
>     and the relative interests of those states in the
>     determination of the particular issue,
>
>(d)  the protection of justified expectations,
>
>(e)  the basic policies underlying the particular field
>     of law,

(f)  certainty, predictability and uniformity of
     result, and

(g)  ease in the determination and application of the
     law to be applied.

Section 145 of the Restatement also counsels that, when applying

Section 6, the following contacts are to be considered by the

Court:

(a)  the place where the injury occurred,

(b)  the place where the conduct causing the injury
     occurred,

(c)  the domicile, residence, nationality, place of
     incorporation and place of business of the parties, and

(d)  the place where the relationship, if any between the
     parties is centered.

Restatement (Second) of Conflict of Laws § 145(2).

     As one court has noted, "[u]nlike more conventional torts, a

breach of fiduciary duty by an officer or director based on

actions causing the corporation to incur additional debt is not

manifested through identifiable physical conduct or harm.  As

such, the corporation sustains an injury in the state of

incorporation and wherever it has offices." In re Innovation

Fuels, Inc., Case No. 11-1291 (DHS), 2013 WL 3835827, *6 (Bankr.

D.N.J. July 23, 2013).  Furthermore, an officer's alleged breach

of fiduciary duty to a corporation is "a matter peculiar to the

relationships among and between the corporation and its . . .

officers" and, accordingly, favors application of the law of the

state of incorporation.  Storetrax.com, Inc. v. Gurland, 168 Md.

10

App. 50, 895 A.2d 355, 372-73 (2006) (finding that lower court erred in concluding that internal affairs doctrine presumption was rebutted in breach of fiduciary claim against corporate director).

According to the Dunham defendants, the court should not apply West Virginia law because

> although Ameribank is a West Virginia bank, the relationship involving Bristol was unquestionably centered in Florida.  Bristol was headquartered in Florida and the relationship with Bristol was managed in Florida; the MLSS agreement was formed in Florida; and the purpose of the MLSS Agreement was to stimulate asset growth in the Florida market through increased lending.

Dunham Brief at p. 13.  This court disagrees because, notwithstanding Florida's connection to the Bristol relationship, the facts and circumstances here are not so unusual that Florida law should govern defendants' duties and liabilities as officers of Ameribank.

At the outset, it is important to underscore that the internal affairs doctrine applies except in the "unusual case" where another state has a more significant relationship to the parties and the occurrence.  For this reason, the presumption that the internal affairs doctrine will apply is not easily overcome.  See Restatement § 309(c) ("[T]he local law of the state of incorporation has usually been applied even in a situation where it might be thought that some other state had a greater interest than the state of incorporation in the issue to

be determined. The local law rule of a state other than the state of incorporation is most likely to be applied in a situation where this rule embodies an important policy of the other state and where the corporation has little contact with the state of its incorporation."); see also Vantagepoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1113 (Del. 2005) ("[T]he conflicts practice of both state and federal courts has consistently been to apply the law of the state of incorporation to the entire gamut of internal corporate affairs.") (internal citations and quotations omitted).

First, as the FDIC notes, application of Florida law herein would "disserve" the policy underlying the internal affairs doctrine: "shielding directors and officers from conflicting legal obligations." Resolution Trust Corp. v. Everhart, 37 F.3d 151, 154 (4th Cir. 1994) (quoting Resolution Trust Corp. v. Chapman, 29 F.3d 1120, 1127 (7th Cir. 1994) (Posner, J., dissenting)). Second, there is nothing to indicate the parties expected or were justified in expecting that Florida law would apply to a dispute like this. Rather, it stands to reason that the Bank's shareholders and officers would have expected that their duties and liabilities as officers of a West Virginia bank would be governed by West Virginia law and that application of Florida law herein would defeat those expectations.

Furthermore, the Dunham defendants have "not shown that Florida has the type of overriding interest in applying its laws to this dispute so as to rebut the presumption that the laws of the state of incorporation apply to claims for breach of fiduciary duty by officers. . . ." <u>Mukamal v. Bakes</u>, 378 F. App'x 890, 897 (11th Cir. 2010).  Finally, there is nothing to indicate that Ameribank Bank had "little contact with the state of its incorporation" such that application of Florida law might be justified.  Rather, it is clear that the Bank was headquartered in West Virginia, had offices there, and several of the defendants named herein were based in West Virginia.

The Dunham defendants have failed to persuade the court that Florida has a more significant relationship to the parties or the transaction at issue here.  Accordingly, the court will follow the general rule and apply the law of the state of incorporation, i.e., West Virginia.

B.  *Business Judgment Rule*

Defendants move for dismissal based on the business judgment rule, which they argue "operates as a substantive rule of law that immunizes directors and officers from liability for alleged misconduct consisting of ordinary negligence."  Baldini Memo. at 7.  Defendants seek to have the negligence count dismissed because, according to them, the business judgment rule acts as a complete shield for alleged misconduct consisting of nothing more

than ordinary negligence.  They also argue that because the law does not recognize a claim for negligence by corporate officers and directors, any claim brought against such a corporate officer based only on negligence can be dismissed without any further factual inquiry.

Generally speaking, the business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), overruled in part on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  As defined by the drafters of the Model Business Corporation Act, the business judgment rule is a presumption, rebuttable by the challenging party, that corporate directors act "in good faith, on an informed basis, and in the honest belief that the action taken is in the best interests of the corporation."  MBCA Ann., Cmt. to § 8.31; see also Aronson v Lewis, 473 A.2d 805, 812 (Del. 1983).  Since it operates as a presumption, a plaintiff will have a chance to rebut that presumption by demonstrating specific instances of conduct that demonstrate the agent was acting in a culpable manner inconsistent with the presumption afforded him by the business judgment rule.  See id.

The business judgment rule does not protect all actions taken by corporate officers and directors.  For example, the business judgment rule does not apply where the business decision in question is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or, as is alleged in this case, results from prolonged failure to exercise oversight and supervision.  See, e.g., FDIC v. Spangler, 836 F. Supp.2d 778, 792 (N.D. Ill. 2011) ("It is a prerequisite to the application of the business judgment rule that the directors exercise due care in carrying out their corporate duties.  If directors fail to exercise due care, then they may not use the business judgment rule as a shield to their conduct.") (internal citations and quotations omitted); FDIC v. Stahl, 840 F. Supp. 124, 128 (S.D. Fla. 1993) (same) (citing Joy v. North, 692 F.2d 880 (2nd Cir. 1982)); Stamp v. Touche Ross & Co., 636 N.E.2d 616, 621 (Ill. 1993) (The business judgment rule does not shield "directors who fail to exercise due care in their management of the corporation.").  It has been said that the rule has "no role where directors have either abdicated their function, or absent a conscious decision, failed to act." Silver v. Allard, 169 F. Supp.2d 966, 970 (N.D. Ill. 1998) (internal quotation marks and citation omitted); see also Aronson v Lewis, 473 A.2d 805, 813 (Del. 1983) ("[The business judgment rule] has no role where

directors have either abdicated their functions, or absent a conscious decision, failed to act.").

The contours of the business judgment rule in West Virginia is the subject of much dispute between the parties. Defendants argue that the rule is well-established at common law to protect both directors and officers from liability for "mere errors of judgment or want of prudence." Baldini Memo at 9-10 (quoting Young v. Columbia Oil Co. of West Virginia, 158 S.E. 678, 682 (W. Va. 1931)).[1] The FDIC counters that the business judgment rule does not shield defendants from liability because: (1) the common law business judgment rule protects the actions of corporate directors, not officers; (2) even if the common law rule could be read to protect officers as well as directors, that rule has been subsumed by the West Virginia Business Corporation Act ("WVBCA"); and (3) the statutory business judgment rule embodied in the WVBCA plainly does not protect corporate officers in the same way it protects corporate directors. FDIC Memorandum at 11-16.

---

[1] According to the Young court, "[i]n the transaction of corporate business, reasonable intelligence and good faith are all that is required of the directors. They cannot be held responsible for mere errors of judgment or want of prudence. These directors could have forfeited the rights of the corporation and shareholders to third persons, if acting in good faith." Young v. Columbia Oil Co. of West Virginia, 158 S.E. 678, 682 (W. Va. 1931).

16

The FDIC argues that the West Virginia Supreme Court of
Appeals has never applied the business judgment rule to protect
corporate officers for acts done solely in their capacity as
officers.  All the cases cited by defendants include allegations
of wrongdoing done in the defendant's capacity as a corporate
director.  See Masinter v. Webco Co., 261 S.E.2d 433, 438 (W. Va.
1980) (noting that officers and directors are accorded broad
latitude in conducting corporate affairs, but applying such
latitude in a suit against actions taken both as officer and
director); Meadows v. Bradshaw-Diehl Co., 81 S.E.2d 63, 68 (W.
Va. 1954) (directors generally free, absent bad faith or fraud,
to exercise discretion free from judicial interference); Young v.
Columbia Oil, 158 S.E. 678, 682 (W. Va. 1931) ("In the
transaction of corporate business, reasonable intelligence and
good faith are all that is required of the directors"); Elliott
v. Farmer's Bank of Philippi, 57 S.E. 242 (W. Va. 1907) (in a
suit only against directors, stating that both officers and
directors are liable for frauds or losses resulting from gross
negligence, but not addressing whether they would also be liable
for less).

There is persuasive authority for the FDIC's argument that
the business judgment rule does not and should not shield the
conduct of corporate officers.  See, e.g., FDIC v. Van Dellen,
No. CV 10-4915 DSF (Shx), 2012 WL 4815159, *6 (C.D. Cal. Oct. 5,

17

2012) ("Defendants argue that the Court should extend the California common law business judgment rule by finding that officers, in addition to directors and officer-directors, are entitled to its protections.  California courts have not extended the rule to officers, and this Court declines to do so.").  As one commentator pointed out, "although many decisions state that the rule applies to officers, several of these cases involved officers who also served as directors.  Consequently, it is unclear whether the rule would be extended to an officer *qua* officer."  Lyman P.Q. Johnson, <u>Corporate Officers and the Business Judgment Rule</u>, 60 Bus. Law. 439, 440-41 (2005).[2]

On the other hand, defendants' position that the business judgment rule should apply to officers on the same terms as it does corporate directors has considerable support.  <u>See</u> <u>id.</u> at 441-43.  The American Law Institute's (ALI's) Principles of Corporate Governance state:

> Sound public policy points in the direction of holding officers to the same duty of care and business judgment

---

[2] Johnson notes that "[a] close review of decisions also reveals that, almost without exception, courts fail to state <u>why</u>, on policy grounds, the rule is (or should be) applied to officers in the same expansive way it is said to apply to directors."  Johnson at 441 (emphasis in original).

In support of his position that the protections of the business judgment rule should not extend to officers, Johnson contends that applying the business judgment rule to the conduct of corporate officers "is to jettison the well established standard of ordinary care required of officers in their capacity as agents."  <u>Id.</u> at 449.

18

standards as directors, as does the little case
authority that exists on the applicability of the
business judgment standard to officers, and the views
of most commentators support this position.

Johnson at 441-42 (quoting 1 <u>Principles of Corporate Governance:</u>
<u>Analysis and Recommendations</u> § 4.01( c) (American Law Institute
1994)); Lawrence A. Hammermesh and A. Gilchrist Sparks, III,
<u>Corporate Officers and the Business Judgment Rule: A Reply to</u>
<u>Professor Johnson</u>, 60 Bus. Law. 865,  (2005)("[P]olicy rationales
underlying the development and application of the business
judgment rule to corporate directors similarly justify
application of the rule to non-director officers, at least with
respect to their exercise of discretionary delegated
authority.").

The FDIC also contends that § 31D-8-842 of the WVBCA has
codified the business judgment rule as it applies to the conduct
of officers.  Defendant Sutton, on the other hand, contends that
W. Va. Code § 31D-8-842 is irrelevant to a court's consideration
of the common law business judgment rule.  <u>See</u> Sutton Reply Memo.
at 4 n.4 ("Sutton is not asking the Court to interpret [West
Virginia § 31D-8-842]; he is asking the Court to apply the common
law business judgment rule. . . .").

There is some authority for both positions.  Some courts
have suggested that legislative enactment of standards of conduct
for directors and officers amounts to a codification of the
business judgment rule.  <u>See, e.g.</u>, <u>Winkler v. Price</u>, No.

19

8:13CV52, 2013 WL 3776541, *4 (D. Neb. Jul. 17, 2013) (noting
that "Nebraska has codified the business judgment rule as it
applies to directors and officers of a corporation" by adoption
of standards of conduct).  Others have noted that legislatively
enacted standards of conduct have little to do with the common
law business judgment rule.[3]

---

[3] The answer likely lies somewhere in between the two
positions of the parties.  It is difficult for this court to
accept that the West Virginia legislature enacted a statute that
sets out the standards of conduct applicable to a corporation's
officers but that those standards are wholly irrelevant to
whether an officer's conduct is shielded from liability by
operation of the business judgment rule.  The business judgment
rule is merely a presumption of regularity that allegedly
attaches to the decisions of a corporate officer, a presumption
that may be overcome.  See, e.g., CDX Liquidating Trust v.
Venrock Assoc., 640 F.3d 209, 215 (7th Cir. 2011) ("When a
director is sued for breach of his duty of loyalty or care to the
shareholders, his first line of defense is the business-judgment
rule, which creates a presumption that a business decision . . .
was made in good faith and with due care. . . . But the
presumption can be overcome. . . ."); In re Tower Air, Inc., 416
F.3d 229, 238 (3d Cir. 2005) (noting the high bar a plaintiff
faces in overcoming Delaware's business judgment rule but stating
"that it may be accomplished by showing either irrationality or
inattention").

    In West Virginia, perhaps that presumption can be overcome
by a showing that the officer's conduct fell short of the
statutory duties set forth in § 31D-8-842.  Cf. Seafirst Corp. v.
Jenkins, 644 F. Supp. 1152, 1159 (W.D. Wash. 1986) (determining
that business judgment rule was not satisfied under Washington
law by proof of good faith alone because statutory standard of
care governed determination whether officers and directors
exercised due care in fulfillment of their responsibilities).
Or, perhaps compliance with the standards of conduct should be
viewed as a precondition to application of the business judgment
rule.  See, e.g., Resolution Trust Corp. v. Gladstone, 895 F.
Supp. 356, 369 (D. Mass. 1994) ("The Business Judgment Rule
shields directors and officers from liability for corporate
decisions made in good faith and after due care.  In effect, it

Fred W. Triem, <u>Judicial Schizophrenia in Corporate Law: Confusing the Standard of Care with the Business Judgment Rule</u>, 24 Alaska L. Rev. 23 (2007) ("Courts are confusing the Business Judgment Rule with the standard of care that governs the conduct of corporate directors and officers.")

However, for the reasons that follow, the court need not decide these legal issues at this juncture because even if West Virginia has adopted a business judgment rule, and even if that business judgment rule protects corporate officers as well as directors, and even if it is unaffected by W. Va Code § 31D-8-842,[4] it is too early in the litigation to determine if defendants are entitled to its protection.  Determining under what circumstances the business judgment rule applies and what kinds of professional conduct violate its protections generally requires investigation into specific facts that do not appear on the face of the average pleading.

---

allows corporate managers to do their job – take risks in search of return on investment.  Nevertheless, the Rule is not without limits, limits framed by the concepts "due care" and "good faith.").  However, for reasons discussed below, that decision is left to another day.

[4] Furthermore, in the event that defendants' conduct is to be judged against the standards of conduct laid out in West Virginia Code § 31D-8-842, there is authority that these standards set forth an ordinary negligence standard.  <u>See, e.g.</u>, <u>FDIC v. Christensen</u>, No. 3:13-cv-00109-PK, 2013 WL 3305242, *2 (D. Or. Jun. 28, 2013) (holding that Oregon's statutory standards of conduct for officers, which are substantially similar to the West Virginia standards of conduct, "plainly set forth an ordinary negligence standard").

Whether or not it is considered an affirmative defense,[5] there is overwhelming authority to support the FDIC's position that the business judgment rule is highly fact dependent and, therefore, inappropriate for consideration on a motion to dismiss.  See, e.g., In re Tower Air, 416 F.3d 229, 238 (3d Cir. 2005) ("Generally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under 12(b)(6)."); FDIC v. Hawker, No. CV F 12-0127 LJO DLB, 2012 WL 2068773, *9 (E.D. Cal. June 7, 2012) (holding that the business judgment rule is a fact-based affirmative defense and that "the absence of allegations of fraud, bad faith or gross overreaching does not render irrelevant factual issues as to application of the business judgment rule"); Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd., No. 05-60080, 2008 WL 926509, at *5 (S.D. Fla. Mar. 31, 2008) ("[T]he Court considers it unwise to evaluate conduct and determine whether or not it is protected by the business judgment rule at the motion to dismiss stage."); In re Luxottica Group S.P.A. Securities Litig., 293 F. Supp.2d 244, 238 (E.D.N.Y.

---

[5] See In re LandAmerica Fin. Group, Inc., 470 B.R. 759, 790 (Bankr. E.D. Va. 2012)(finding that Virginia's business judgment rule must be asserted as an affirmative defense); Ad Hoc Comm. Of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 556 (D. Del. 2008) (treating business judgment rule as affirmative defense); Resolution Trust Corp. v. Heiserman, 839 F. Supp. 1457, 1464 (D. Co. 1993)("The business judgment rule, however, is an affirmative defense").

2003)(finding that exercise of business judgment by a director is a question of fact not to be considered on a dismissal motion); FDIC v. Stahl, 840 F. Supp. 124, 128 (S.D. Fla. 1993) ("The application of the business judgment rule for purposes of a motion to dismiss is questionable."); Resolution Trust Corp. v. Heiserman, 839 F. Supp. 1457, 1464-65 (D. Colo. 1993) ("[T]he business judgment rule is a fact bound affirmative defense which provides no basis for dismissal under Rule 12(b)(6)."); Federal Sav. And Loan Ins. Co. v. Musacchio, 695 F. Supp. 1053, 1064 (N.D. Cal. 1988) ("[A] ruling on the applicability of the business judgment rule is peculiarly a question of fact, wholly inappropriate for consideration on a motion to dismiss."); Gilbert v. Bagley, 492 F. Supp. 714, 738 (M.D.N.C. 1980) ("Application of the business judgment rule defense necessarily depends upon facts as developed at trial and is thus an inappropriate ground for dismissal.").[6]

---

[6] Defendants are not without authority for their argument that a court may apply the business judgment rule on a Rule 12(b)(6) motion.  For this proposition, Baldini relies on three recent cases decided in the Northern District of Georgia.  In those cases, the court noted that the business judgment rule in Georgia is very well-settled.  "Allegations amounting to mere negligence, carelessness, or lackadaisical performance are insufficient as a matter of law [to rebut the business judgment rule]."  Federal Deposit Ins. Corp. v. Blackwell, No. 1:11-cv-03423, 2012 WL 3230490, *4 (N.D. Ga. Aug.3, 2012)(quoting Brock Built, LLC v. Blake, 686 S.E.2d 425,430 (Ga. Ct. App. 2009) (emphasis added); see also FDIC v. Briscoe, Civil Action No. 1:11-CV-02303, *2 (N.D. Ga. Aug. 14, 2012) ("[T]he Court finds that consideration of the business judgment rule in the context of said rule being a presumption and/or affirmative defense is

The court agrees with the foregoing authorities that application of the business judgment rule requires a fact-intensive analysis that is inappropriate for resolution on a 12(b)(6) motion.  Even assuming defendants are entitled to the benefit of the business judgment rule's presumption, it remains to be seen if the FDIC can rebut that presumption.

> The court finds that defendants cannot shield themselves from liability based on the business judgment rule at this early stage.  Even if the business judgment rule could be addressed, the plaintiff has adequately pled conduct that arguably would not be excused by the defense.  The plaintiff's allegations, taken as true, are sufficient at this stage to rebut any presumption in favor of [officer]-approved transactions that would be created by the business judgment rule.

Winkler v. Price, No. 8:13CV52, 2013 WL 3776541, *6 (D. Neb. Jul. 17, 2013).  Accordingly, defendants' motions to dismiss to the extent they rely on the business judgment rule are DENIED.

C.   *Twombly* and *Iqbal*

---

proper at this early context (i.e., only as to the ordinary negligence claims), where the issue of the BJR appears on the face of the Complaint and is limited by the law of Georgia, not dependent upon additional evidentiary facts.") (emphasis in original); FDIC v. Skow, No. 1:11-cv-0111, slip op. (N.D. Ga. Feb. 27, 2012) (dismissing FDIC's claims for ordinary negligence and breach of fiduciary duty based on ordinary negligence because, under Georgia law, business judgment rule bars claims for ordinary negligence).  Significantly, all three courts refused to dismiss the FDIC's claims for gross negligence.

However, the court finds that these cases represent the minority view.  In any event, the FDIC's allegations in this case survive invocation of the rule at this stage of the proceedings.

Defendants also argue that they are entitled to dismissal of all three counts because the complaint fails to allege sufficient plausible claims tying their specific conduct to any injuries suffered by the FDIC as receiver for Ameribank.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is designed to test only the sufficiency of the plaintiff's allegations.  As such, it "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  <u>Tobey v. Jones</u>, 706 F.3d 379, 387 (4th Cir. 2013) (quoting <u>Republican Party of North Carolina v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure, which defines a complaint, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677 (2009).

Modern cases have made clear, however, that while the official standard in federal courts is still the lenient one of accepting all well-pled facts as true and construing them in the light most favorable to the plaintiff, not all allegations are to be considered "well-pled."  <u>Nemet Chevrolet, Ltd. V. Consumeraffairs.com,</u> 591 F.3d 250, 255 (4th Cir. 2009).  Specifically, the Supreme Court has drawn the line between factual allegations and legal conclusions: "the tenet that a court must accept as true all of the allegations contained in a

25

complaint is inapplicable to legal conclusions". Iqbal, 556 U.S. at 678. As such, in order to survive a 12(b)(6) motion, a complaint must allege sufficient factual material, above and beyond mere legal conclusions which are not entitled to truth, "to state a claim to relief that is plausible on its face." Id. at 676 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when it alleges sufficient factual content to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id.

The primary purpose of the complaint, however, remains as a notice-giving device. As such, neither the Federal Rules nor any binding court opinion has required detailed factual allegations at the pleading stage. All that is required is that the complaint "give the defendant fair notice of what the … claim is and the grounds upon which it rests." Tobey, 706 F.3d at 387 (quoting Twombly, 550 U.S. at 555); see also Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). The complaint need not make out a prima facie case or even demonstrate probable liability; it must only nudge the allegations "across the line from conceivable to plausible." Iqbal, 556 U.S. at 680.

Defendants seek to hold the FDIC to a higher standard than that required by the federal rules. When bringing a negligence claim, a plaintiff need not prove the four elements of a tort

26

case in their pleading.  The decisions in <u>Twombly</u> and <u>Iqbal</u> do not change the generally liberal standard of notice pleading. Those decisions suggest that a court can disregard legal conclusions that amount to formulaic recitations of a cause of action but they do not empower a district court judge to weigh the credibility of genuine factual allegations.

In the present case, the complaint alleges sufficient factual content.  For example, it specifically accuses <u>all</u> named defendants of "wrongfully allow[ing] Bristol to exercise unfettered and unsupervised control over the underwriting of a large number of loans funded by Ameribank."  Complaint at ¶ 2. It also alleges that this lending structure, with Bristol in complete control, amounted to a failure on the part of all defendants to provide meaningful oversight or control of Bristol's underwriting practices.  <u>Id.</u> at ¶ 3.  Taken as true, these allegations certainly give rise to a plausible claim that the defendants were negligent in their supervisory capacity as officers of Ameribank.

The complaint does not stop there, however.  It goes on to allege that the defendants' failure to properly oversee Bristol's underwriting practices caused them to fund seriously deficient loans in specific violation of "(1) the contract between Bristol and Ameribank, (2) Bristol's loan policies, (3) Ameribank's loan policies, (4) applicable underwriting requirements, and (5)

27

prudent lending practices." Id.  As a concrete example of the
harm wrought by the defendants' alleged negligence, the FDIC
provided detailed descriptions of 32 allegedly deficient loans,
21 of which it alleges Ameribank did not even go through the
formality of signing off on.  Id. at ¶¶ 92-124.  To the detriment
of Ameribank, the complaint alleges that "Defendants negligently
failed to supervise the Bristol relationship, failed to adhere to
applicable loan policies and prudent lending practices, and
allowed the Bank to fund the Deficient Loans." Id. at ¶ 130.
The causal link is clear: negligent oversight led to the funding
of deficient loans, the existence of which directly damaged
Ameribank.

If all of the above is taken as true, the FDIC has made out
a plausible case of not only negligence, but gross negligence
against defendants. The complaint has alleged that the defendants
essentially abdicated oversight completely in the context of the
Bristol arrangement. Whether or not the defendants were
specifically aware of the dangers associated with CRA loans, and
the complaint has alleged that they were, allegations of complete
nonfeasance with respect to what was happening to the money they
had been entrusted to manage makes out a plausible claim for
gross negligence above and beyond a simple lack of due care.[7]

---

[7] Defendant Baldini's assertion to the contrary, the
complaint does contain specific allegations against him. It
specifically alleges that he controlled the Bank's

Defendants may doubt the credibility of these allegations or the likelihood that they can be proven at trial.  But such considerations are not appropriate for 12(b)(6) consideration. Taken as true, the well-pleaded allegations in the FDIC's complaint give rise to a plausible claim that defendants were negligent in their capacity as officers of Ameribank, with the result being the funding of damaging loans that failed to meet the underwriting standards of either Bristol or Ameribank. Viewed in the light most favorable to the FDIC, the court finds that the claims against all defendants satisfy <u>Twombly</u> and <u>Iqbal</u> and the motions to dismiss on that ground are DENIED.

D.   *The FDIC Has Sufficiently Pled a Claim of Gross Negligence*

Defendants have moved to dismiss the claim for gross negligence, arguing that the "FDIC has not plausibly alleged – and cannot plausibly allege – that defendants acted with utter disregard for prudence, the standard for a gross negligence claim."  Sutton's Memo at 2.

---

operations—along with Sutton—from January 18, 2007, until October 9, 2007. <u>Id.</u> at ¶ 77. During this time period, the relationship with Bristol was in full effect. In fact, the complaint alleges that the Bristol CRA program "significantly expanded" under the period of Baldini's oversight to the point that it violated internal policy limitations. <u>Id.</u> at 47, 71.

To that extent that Baldini and the other defendants have moved for dismissal based upon the time periods for which they were not officers of the Bank, those issues are more properly addressed via a motion for partial summary judgment wherein the court has the benefit of a complete factual record.

> West Virginia law "recognizes a distinction between
> negligence, including gross negligence and wilful
> [sic], wanton, and reckless misconduct." Mandolidis v.
> Elkins Indus., 161 W. Va. 695, 246 S.E. 2d 907, 913
> (1978). While the West Virginia Supreme Court of
> Appeals has never provided its own definition of gross
> negligence, it has interpreted Virginia law to define
> gross negligence as the "degree of negligence which
> shows an utter disregard of prudence amounting to
> complete neglect of the safety of another." Dodrill v.
> Young, 143 W. Va. 429, 102 S.E. 2d 724, 730 (1958).
> Virginia courts have further defined gross negligence
> as "an utter disregard of prudence, amounting to
> complete neglect of the safety of another, such as to
> be shocking to reasonable men," Finney v. Finney, 203
> Va. 530, 125 S.E.2d 191, 193 (1962), and the "absence
> of slight diligence, or the want of even scant care."
> Colby v. Boyden, 241 Va. 125, 400 S.E. 2d 184, 189
> (1991) (internal quotation omitted).

Rutecki v. CSX Hotels, Inc., 290 F. App'x 537, 542-43, 2008 WL

3992346 (4th Cir. 2008); C line v. 7-Eleven, Inc., Civil Action

No. 3:11-CV-102, 2012 WL 5471761, *3 (N.D.W. Va. Nov. 9, 2012)

(same).

     The court finds that the FDIC's factual allegations state a

plausible claim for gross negligence under West Virginia law.

According to the complaint:

- Defendants wrongfully allowed Bristol to exercise
  unfettered and unsupervised control over the
  underwriting of a large number of loans funded by
  Ameribank. Bristol performed all originating,
  underwriting, processing, and servicing functions
  for the loans, and the Bank supplied the funds
  without further analysis by Defendants as required
  by safe and sound lending practices.

- This lending structure was inherently risky for
  the Bank because it outsourced to Bristol nearly
  all lending functions for a large number of loans
  that would not have met the Bank's internal
  underwriting standards if originated in-house.

Defendants could not delegate to Bristol the duty to ensure the safety and soundness of the Bank's loan portfolio.  Defendants remained responsible for managing the risks of the Bank's lending operations, including those conducted through Bristol.  Significant monitoring and internal control systems were warranted to ensure the Bank was funding quality loans and following sound lending practices.  However, Defendants failed to provide meaningful oversight or control of Bristol's underwriting of the loans, and Defendants permitted the Bank to fund Bristol-originated loans despite serious deficiencies. Specifically, Defendants allowed the Bank to fund Bristol-originated loans in violation of:  (1) the contract between Bristol and Ameribank, (2) Bristol's loan policies, (3) Ameribank's loan policies, (4) applicable underwriting requirements, and (5) prudent lending practices.

- Under the MLSS Agreement, Ameribank was required to fund all CRA loans presented to it by Bristol provided only that the loans conformed to <u>Bristol's</u> policies and underwriting standards.

- Moreover, the MLSS Agreement put Bristol in control of all aspects of the lending process by granting Bristol authority to conduct credit evaluations, process, underwrite, document, originate, and service the loans it funded with Ameribank's assets.  Ameribank's role was limited to supplying the loan funds.

- The MLSS Agreement required Bristol to certify that each CRA loan presented to Ameribank for funding complied with Bristol's underwriting standards.  In many instances, however, Bristol failed to sign this certification, but Ameribank funded the loans anyway.

- Defendants did not review the borrower's credit information or the loan documents before allowing Bristol to use Bank assets to fund Bristol-originated loans.

- Despite problems with the Bristol relationship that placed the Bank at increasing risk, Dunham and Sutton allowed the terms of the MLSS Agreement

31

to become increasingly and unreasonably favorable
to Bristol.  For example, during the course of the
Bristol relationship, the Bank's yield spread on
Bristol-originated loans was reduced from prime
plus 2.5 percent to prime plus 0.25 percent.

- Defendants disregarded warnings from the OTS about
the high level of risk associated with its
Bristol-related exposure, and they continued to
expand the Bank's relationship with Bristol even
after problems with the Bristol relationship were,
or should have been, apparent.

- In 2006, Dunham and Sutton assured examiners that
they would provide on-site visitations to
Bristol's office to monitor and limit the Bank's
risk.  However, they did not conduct such on-site
visitations as promised.

- Cogswell and O'Brien, acting under and reporting
to Dunham, neglected their duties as officers by
failing to take even minimally adequate steps to
evaluate the loans Bristol offered to the Bank or
to report deficiencies in the loan portfolio.

- After Dunham, Cogswell, and O'Brien resigned in
December 2006 and January 2007, respectively,
Sutton and Baldini significantly expanded the CRA
loan program operated by Bristol without regard to
the then obvious deterioration of Ameribank's CRA
loan portfolio.

- Instead of replacing the Dunham team with capable
management, Sutton and Baldini simply increased
their day-to-day involvement with the Bank's
affairs, but both were unqualified to oversee,
manage, and control the Bank's relationship with
Bristol and Bristol's underwriting of CRA loans.

- In the first quarter of 2007, Sutton and Baldini
violated the Bank's internal limits on CRA loan
concentrations.

- Bristol's abbreviated loan approval policy was not
in conformity with Ameribank's loan policy (which
Defendants considered inapplicable under the MLSS
Agreement) and appears to have been adopted by the

32

MLSS Agreement simply to increase Ameribank's loan volume.

- Under the MLSS Agreement, Ameribank could only reject CRA loans offered to it by Bristol if the loans failed to meet Bristol's underwriting standards.

- Despite regulators' repeated warnings, Defendants unreasonably relied on Bristol at every stage of the lending process, notwithstanding that Bristol engaged in seriously deficient loan underwriting, administration, and approval practices, including: (a) extending loans evaluated or approved by financially interested personnel or third-party contractors and otherwise extending loans without independent review or analysis; (b) approving loans involving speculative ventures or repayment sources to borrowers who were not creditworthy and for projects that provided inadequate collateral; (c) failing to document loan approvals, underwriting, and administration, and failing to ensure that loan proceeds were used in accordance with loan terms, the MLSS Agreement, and loan policies; (d) financing multiple projects controlled by the same borrower; (e) extending loans on the basis of improperly performed appraisals or on the basis of faulty estimates of rehabilitation costs; and (f) relying on borrowers' and guarantors' stated financial statements, which were often inadequate or inaccurate, with no verification.

- Although Defendants treated the Bristol CRA loan program as if it were exempt from Ameribank's loan policy, no exemption was reflected in the Bank's policy or was ever approved by Ameribank's Board of Directors.  All of the deficient loans fell below the standards set forth in the Bank's loan policy.

- Further, two of the deficient loans originated by Bristol were funded in September 2007 after the OTS ordered Ameribank to stop accepting loans from Bristol altogether.

- The OTS recommended that the Bank adopt internal limits on assets related to the Bristol

relationship.  In accordance with this recommendation, Dunham, Cogswell, and O'Brien adopted limits on the Bristol loan concentration, but those policy limits were not in accordance with the OTS's recommendations and they were subsequently raised.  Moreover, Sutton and Baldini later violated these limits after they assumed direct oversight responsibility for the Bristol relationship in the first quarter of 2007.

- The examiners also expressed concern that the Bank had achieved its rapid loan growth without having hired an additional loan officer as originally planned.  Although Dunham assured the OTS that the Bank intended to hire another loan officer, the Bank never did.

- In the RoE delivered on September 21, 2005, the OTS criticized the Bank's failure to increase staff to support its rapid loan growth as previously recommended.  Dunham and Sutton again assured the OTS that the Bank would hire additional staff.

Complaint ¶¶ 2, 3, 33, 34, 37, 38, 43-47, 51, 52, 54, 55, 58, 60, 61, and 81-83.

These allegations state a plausible claim for gross negligence as they arguably demonstrate "an utter disregard of prudence."  See, e.g., FDIC v. Florescue, No. 8:12-cv-2547-T-30TBM, 2013 WL 2477246, *6 (M.D. Fla. June 10, 2013) (denying motion to dismiss gross negligence claim against bank's directors and officers where FDIC alleged they "deliberately pursued a speculative, high-risk growth strategy, the risks of which were compounded by a failure to implement sound credit procedures and practices, even though they had been warned by regulators to curb overconcentration" and "approved transactions in violation of the

34

Bank's own concentration limits"); W Holding Co., Inc. v. Chartis Insur. Co.-Puerto Rico, 904 F. Supp.2d 169, 177 (D. Puerto Rico 2012) (allegations of funding loans despite "failure to obtain appraisals . . . in violation of bank policy," and "failure to heed and act upon escalating examiner and auditor warnings of deficiencies in commercial lending and admininstration" satisfy Iqbal and Twombly in pleading gross negligence on part of bank's officers and directors); FDIC v. Willetts, 882 F. Supp.2d 859, 865-66 (E.D.N.C. 2012) (denying 12(b)(6) motion of bank's officers and directors on FDIC's claim of gross negligence where complaint alleged "that directors were repeatedly warned about regulatory violations and were advised that loans were being made in violation of the loan policy but took no action;" that many loans were approved after an inappropriate level of review; and where "multiple deficiencies with regard to each at issue [were indentified], including improper structuring, insufficient repayment sources, inadequate or wrongly valued securities, loan policy violations, lack of feasibility studies, overstatement of value, insufficient underwriting, and insufficient appraisal bases."); FDIC v. Spangler, 836 F. Supp.2d 778, 786-89 (N.D. Ill. 2011)(finding that FDIC properly alleged gross negligence against bank's officers and directors at motion to dismiss stage where it alleged that defendants failed to follow the bank's written lending policies and ensure prudent underwriting in approving

loans; approved loans without current or complete financial information; and failed to address repeated regulatory warnings about the state of the bank).

Based on the foregoing, defendants' motions to dismiss are denied to the extent that they contend that the FDIC has failed to properly plead a claim of gross negligence.

### IV.  Conclusion

For the reasons discussed above, the motions to dismiss were DENIED.  The Clerk is requested to send a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 14th day of November, 2013.

ENTER:

David A. Faber
Senior United States District Judge